MARTIN TRACTOR COMPANY et al., Appellants,

v.

FEDERAL ELECTION COMMISSION et al.

NATIONAL CHAMBER ALLIANCE FOR POLITICS et al., Appellants,

v.

FEDERAL ELECTION COMMISSION et al.

Nos. 78–2080, 79–1027.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1979.

Decided May 8, 1980.

Rehearing Denied June 10 and June 23, 1980.

---

Stanley T. Kaleczyc, Jr., Washington, D. C., with whom Stephen A. Bokat, Washington, D. C., was on the brief, for appellants in No. 79–1027.

Mark Sullivan, III, Washington, D. C., with whom Edward A. McCabe, John G. Degooyer and Louise A. Sunderland, Washington, D. C., were on the brief, for appellants in No. 78–2080.

Kathleen Imig Perkins, Atty., Federal Election Commission, Washington, D. C., with whom William C. Oldaker, Gen. Coun-

sel, and Charles N. Steele, Associate Gen. Counsel, Federal Election Commission, Washington, D. C., were on the brief, for appellees.

Before McGOWAN, LEVENTHAL * and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellants in these consolidated appeals brought actions in district court seeking declaratory and injunctive relief from certain of the provisions of section 321 of the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. § 441b,[1] ("FECA" or the "Act"). Their complaints alleged that these provisions violate rights guaranteed them by the first and fifth amendments of the United States Constitution, insofar as they restrict "solicitation" of contributions to, and by, certain corporate and trade association political action committees ("PACs" or "separate segregated funds").[2] Appellants sought to have these claims determined under the special expedited judicial review provision of the FECA, 2 U.S.C. § 437h (1976),[3] which requires *en banc* consideration by the circuit courts of those questions

---

* Circuit Judge Leventhal, a member of the panel which heard oral argument in this case, died before the case was decided.

1. Appellants in No. 78–2080, *Martin Tractor Company v. FEC* [hereinafter *Martin Tractor*], challenge those provisions of this section which effectively restrict the times, manner and place of "solicitation" of contributions by corporate "political action committees" ("PACs" or "separate segregated funds," *see* note 2, *infra*) of non-management employees. The core provisions challenged are contained in 2 U.S.C. § 441b(b)(4)(A) and (B) (1976):

> (4)(A) Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful—
>
> (i) for a corporation, or a separate segregated fund established by such a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families . . . . .
>
> (B) it shall not be unlawful under this section for a corporation, a labor organization, or a separate segregated fund established by such corporation or such labor organization, to make 2 written solicitations for contributions during the calendar year from any stockholder, executive or administrative personnel, or employee of a corporation or the families of such persons. A solicitation under this subparagraph may be made only by mail addressed to stockholders, executive or administrative personnel, or employees at their residence and shall be so designed that the corporation, labor organization, or separate segregated fund conducting such solicitation cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution.

Appellants in No. 79–1027, *National Chamber Alliance for Politics v. FEC* [hereinafter *National Chamber*], challenge all those provisions of the section that purport to restrict or may restrict the solicitation of contributions by trade association PACs. This includes subparagraph 4(A) already quoted and the following additional subparagraphs:

> (C) This paragraph shall not prevent a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by a membership organization, cooperative, or corporation without capital stock, from soliciting contributions to such a fund from members of such organization, cooperative, or corporation without capital stock.
>
> (D) This paragraph shall not prevent a trade association or a separate segregated fund established by a trade association from soliciting contributions from the stockholders and executive or administrative personnel of the member corporations of such trade association and the families of such stockholders or personnel to the extent that such solicitation of such stockholders and personnel, and their families, has been separately and specifically approved by the member corporation involved, and such member corporation does not approve any such solicitation by more than one such trade association in any calendar year.

2 U.S.C. § 441b(b)(4)(C) and (D) (1976).

2. The challenged section of the Act speaks not of political action committees but of "separate segregated funds." For our purposes the two terms are used synonymously.

3. The section provides as follows:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitu-

of the Act's constitutionality which are certified by the district court where the complaint is filed.

The district court here certified no questions. Instead, on motion of appellees, the complaints were dismissed,[4] the court holding that the facts of neither case presented a "case or controversy sufficiently ripe for declaratory action." The court also concluded that appellants were not among the individuals eligible to seek review under § 437h. Several were deemed not eligible because they did not fall into any of the statutorily-specified categories of eligible

complainants; and others because the merits of their claims bore little or no relation to the characteristic which rendered them arguably eligible to proceed under § 437h.

For reasons that vary only slightly from those given by the district court, we find the cases nonjusticiable as a constitutional matter and inappropriate for adjudication as a prudential matter.[5] We therefore affirm the dismissals of the complaints and in view of this disposition we do not confront the issue of the scope or applicability to this case of § 437h.[6]

tionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

**4.** *Martin Tractor Co. v. FEC*, 460 F.Supp. 1017 (D.D.C.1978); *Nat'l Chamber Alliance for Politics v. FEC*, Civ. No. 78–1333 (D.D.C. Nov. 22, 1978), *National Chamber* Appendix (App.) 97–98.

**5.** Since we hold that these appellants present no justiciable "case or controversy" we need not decide or consider the circumstances under which a court might decline for prudential reasons alone to reach the merits of a constitutional challenge to the FECA. This court has indicated that even when a complaint is governed by the special FECA review provisions, a live "case or controversy" might be dismissed for prudential reasons. *Clark v. Valeo*, 559 F.2d 642, 650 n. 11 (D.C.Cir.) (*en banc*), aff'd mem. sub nom. *Clark v. Kimmit*, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977). Judge Leventhal, concurring in *Clark*, would have rested his dismissal of that case entirely on prudential grounds. *Id.* at 657. Judge Robinson, dissenting, disagreed, *id.* at 669, arguing that Congress in the FECA and the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), had eliminated from adjudication under § 437h the extra-constitutional aspects of "justiciability." The majority took issue with Judge Robinson's dissent:

To the extent [Judge Robinson's] language may be read as suggesting a view that Congress may "command" the judiciary to act contrary to the rules relative to ripeness the Supreme Court has developed "for its own governance in the cases confessedly within its jurisdiction," *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 482, 80 L.Ed. 688 (Brandeis, J., concurring), we respectfully disagree.

*Id.* at 650, n. 11. We take note of the majority's position in *Clark* but since we find it unnecessary to decide the cases now before us on prudential grounds alone, we do not employ their understanding here, even assuming, *ar-*

*guendo,* the judicial review provisions of § 437h applied.

**6.** With respect to § 437h, the questions presented are: (1) whether the availability of judicial review under § 437h is limited to the classes of individuals or groups expressly mentioned as eligible to seek review under its terms; and (2) whether the capacity in which or the reasons for which an individual or group seeks review should determine the availability of the procedure provided in § 437h. By its own terms § 437h is available to "the Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States."

The district court concluded that § 437h was not open to any of these appellants. In *Martin Tractor* the court reasoned that the appellants were not "the Commission" or the "national committee of any political party" and that the individual plaintiffs put at issue ". . . not their rights as voters, but rather the constitutionality of the Act's provisions relating to communications between a corporation and its employees about voluntary contributions." 460 F.Supp. at 1019. In *National Chamber* the court concluded:

The same factors which required dismissal of the action in *Martin Tractor* prove fatal to plaintiff's case here. The special standing provision of 2 U.S.C. § 437h(a) is inapplicable to the Chamber and its PAC as they are not among the entities enumerated in that provision. The Court's reasoning in *Martin Tractor* as to the standing of the corporate executives and hourly employees under § 437h(a) applies equally to the individual plaintiffs here. They sue not in their individual capacities but rather to vindicate the rights of the corporate entities. That derivative right was not the constitutional right of an "individual eligible to vote" which Congress considered "appropriate" for vindication in a declaratory judgment action under this section.

*National Chamber* App. at 97–98.

The district court's conclusion conflicts with the conclusion of the only other court to have

## I. SOME GENERAL PRINCIPLES

### A. *Principles of Justiciability*

The congeries of doctrines which together comprise the requirements of justiciability interpose an obstacle in each case between the complainant and any decision on the merits of his or her complaint. Although the "case or controversy" requirements of Article III are the foundation of the body of law from which the criteria of justiciability have been fashioned, the prudent exercise of the judicial function, especially in reviewing the constitutionality of legislative acts, has been responsible for the development of much of the edifice of the doctrine.[7]

■ To establish a justiciable claim under Article III, a plaintiff must allege "such a personal stake in the outcome of the controversy as to assure . . . concrete adverseness . . . ." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Further, the plaintiff must allege an actual injury[8] or the certainty of future injury. "A hypothetical threat is not enough." *United Public Workers v. Mitchell*, 330 U.S. 75, 90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). If the injury be a future one, the occurrence of the injury must be reasonably certain and clearly describable for the action to be deemed "ripe" for adjudication. The mere possibility of prosecution or the possibility that sanctions authorized under a general regulatory regime may be imposed when the regulatory agency is confronted with specific facts developed in some future agency proceeding is insufficient.[9]

Ripeness enters the Article III "case or controversy" picture in the determination whether the requisite injury is in sharp enough focus and the adverseness of the parties concrete enough to permit a court to decide a real controversy and not a set of hypothetical possibilities.

■ As a prudential doctrine, ripeness is in part an expression of the court's inherent discretion when declaratory or injunctive relief is sought. The Court has noted the importance of this discretion when called upon to make a declaration of right, repeating its caution "against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations."[10]

---

faced this question squarely. In *Bread Political Action Comm. v. FEC*, 591 F.2d 29 (7th Cir. 1979), the seventh circuit decided that judicial review under § 437h should not be confined to suits brought by the plaintiffs designated in the statute. We intimate no view as to the correctness of that ruling.

**7.** *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–2635, 57 L.Ed.2d 595 (1978) (delineating both constitutional and prudential components of ripeness). The constitutional requirements for ripeness were stated to be equivalent to those for standing—injury in fact and redress of the injury by the relief requested. For prudential purposes the critical question was stated to be whether deferring decision would better prepare the court by providing additional facts.

**8.** In *Laird v. Tatum*, 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972), the Court applied

[the] established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining, a direct injury as the result of that action . . . .

*Quoting Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

**9.** In *Nat'l Student Ass'n v. Hershey*, 412 F.2d 1103, 1110 (D.C.Cir.1969), this court noted that:

the mere existence of a statute, regulation, or articulated policy is ordinarily not enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms.

*See also Lion Mfg. Corp. v. Kennedy*, 330 F.2d 833 (D.C.Cir.1964).

**10.** *Pub. Affairs Assoc., Inc. v. Rickover*, 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962). *Accord, Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 243, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952) ("the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power"); *Samuels v. Mackell*, 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971) (error to de-

■ Because of the " 'great gravity and delicacy' of [the courts'] function in passing upon the validity of an act of Congress," [11] the need is manifest for a "full-bodied record" [12] in such adjudication. *United States v. UAW*, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957), a case which involved an alleged violation of the statutory predecessor of the provisions at issue here, emphasized the importance of a detailed factual record upon which a court might limit, frame and perhaps avoid a constitutional decision. In that case, the Court upheld the indictment of a labor organization accused of using union dues to sponsor television broadcasts supporting Congressional candidates. Finding the indictment consistent with the terms of the statute, a majority of the Court declined to consider the statute's constitutionality, observing that such challenges should not be considered "unless absolutely necessary to a decision of the case." *Id.* at 590, 77 S.Ct. at 541, *quoting Burton v. United States*, 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482 (1905). The indictment was remanded for trial so that "an adjudication on the merits [would] provide the concrete factual setting that sharpens the deliberative process especially demanded for constitutional decision." *Id.* at 591, 77 S.Ct. at 541. Indeed, counsel for the *National Chamber* appellants concede that "[c]entral to the Supreme Court's exegesis of the ripeness doctrine is the insistance [sic] on a sufficiently defined record to insure informed and appropriately narrow adjudication." Brief for *National Chamber* Appellants at 47.

## B. *Principles of Facial Adjudication*

Since the constitutional challenges pressed upon us here involve assertions of first amendment freedoms in conflict with the FECA, we briefly review the special status of facial first amendment attacks on the constitutionality of statutes or regulations.

■ Within the first amendment arena the jurisprudential criteria for constitutional adjudication are sometimes relaxed when a facial attack is launched. In some cases reaching the merits of facial challenges, standing has been broadened. For example, in *Gooding v. Wilson*, 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972), the chill found by the Court to have been suffered by reason of the challenged ordinance was not limited to the injury experienced by the complaining individual. Thus, it has been suggested, the assertion of vicarious rights, otherwise not countenanced, may be permitted when a facial first amendment challenge is made.[13] In addition, in such cases the ripeness doctrine has been more loosely applied. Reasonable predictability of enforcement or threats of enforcement, without more, have sometimes been enough to ripen a claim. In one such case, *National Student Association v. Hershey*, 412 F.2d 1103 (D.C.Cir.1969), this court held that the chill upon first amendment freedoms induced by a selective service directive concerning participation in "illegal" antiwar protests was a sufficiently concrete harm to permit pre-enforcement examination of the merits of a constitutional challenge to the directive.[14]

clare rights with respect to pending state criminal prosecution) (principles which guide injunctive relief will also guide granting of declaratory judgment); *Lampkin v. Connor*, 360 F.2d 505, 508–09 (D.C.Cir.1966) (broad discretion to decline to issue declaratory judgments).

**11.** *Ashwander v. TVA*, 297 U.S. 288, 345, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**12.** *Pub. Affairs Assoc., Inc. v. Rickover*, 369 U.S. at 113, 82 S.Ct. at 582.

**13.** *See* Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423, 438–40 (1974); *See also NAACP v. Button*, 371 U.S. 415, 432–33, 83 S.Ct. 328, 337–338, 9 L.Ed.2d 405 (1963); *United States v. Raines*, 362 U.S. 17, 21–22, 80 S.Ct. 519, 522–523, 4 L.Ed.2d 524 (1960).

**14.** *Cf. Police Dep't v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (specific interpretation of anti-picketing ordinance had been given by police department). *See also Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (enforcement of oath requirement had been threatened).

On the other hand, decisions reaching the merits of facial constitutional challenges—first amendment and otherwise—are the exception and not the rule. In his opinion for the Court in *Younger v. Harris*,[15] Mr. Justice Black noted:

> Procedures for testing the constitutionality of a statute "on its face" in the manner apparently contemplated by *Dombrowski*,[16] and for then enjoining all action to enforce the statute until the State can obtain court approval for a modified version, are fundamentally at odds with the function of the federal courts in our constitutional plan. . . . [T]he task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary. The combination of the relative remoteness of the controversy, the impact on the legislative process of the relief sought, and above all the speculative and amorphous nature of the required line-by-line analysis of detailed statutes, . . . ordinarily results in a kind of case that is wholly unsatisfactory for deciding constitutional questions, whichever way they might be decided. In light of this fundamental conception of the Framers as to the proper place of the federal courts in the governmental processes of passing and enforcing laws, it can seldom be appropriate for these courts to exercise any such power of prior approval or veto over the legislative process.

401 U.S. at 52–53, 91 S.Ct. at 754–755.[17]

With these not-easily-reconcilable principles in mind, we turn to the particular arguments made in, and the facts presented by, the appeals now before us.

## II.   THE *Martin Tractor* CASE, NO. 78–2080

### A.   *Factual and Procedural History*

In 1975, the Martin Tractor Company established the Kansas Economic Education Political Club ("Keep Club"), a PAC.[18]   At that time the right of a corporation or union to establish, administer and solicit voluntary contributions to a PAC was generally acknowledged, and the only restrictions upon PAC operations were that corporate or union monies be kept separate from PAC monies and that all contributions to PACs be entirely voluntary.  A corporation and its management were free to communicate with all employees and shareholders concerning its PAC and to solicit contributions to the PAC on a regular basis.[19]

The Martin Tractor Company administered the Keep Club in accordance with the above rights and restrictions until May 11, 1976, the effective date of the FECA Amendments of 1976.[20]   Prior to that date, appellants Keep Club, Martin Tractor Company, Martin and Littlejohn (members of the Company's "executive or administrative personnel" group and persons responsible for supervising the Keep Club) communicated with all members of the company's corporate community, including appellant Bramlage (a Martin Tractor hourly employee), concerning the PAC and contributions to it.  They did so orally and in writing, on

**15.**   401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (refusal on equitable grounds to enjoin pending state "criminal syndicalism" prosecution challenged under first amendment).

**16.**   *Dombrowski v. Pfister*, 380 U.S. 479, 88 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (holding abstention inappropriate in challenge by civil rights group to criminal aspects of subversive control laws).

**17.**   *See also Bates v. State Bar*, 433 U.S. 350, 381, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977), *quoting Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) (facial overbreadth review "strong medicine"

to be "employed . . . sparingly and only as a last resort"); *Nat'l Student Ass'n v. Hershey*, 412 F.2d at 1113–15 ("we are not persuaded that every plaintiff who alleges a First Amendment chilling effect and shivers in court has thereby established a case or controversy").

**18.**   *Martin Tractor* App. 5–7.

**19.**   *See Buckley v. Valeo*, 424 U.S. at 28 n.31, 96 S.Ct. at 639.

**20.**   Pub.L.No.94–283, 90 Stat. 475, 502 (1976).

and off the company premises, and more than twice a year.[21]

The 1976 Amendments impose restrictions upon the type, quantity and extent of "solicitation" permitted the appellants. Section 441b divides a corporation and those persons having a community of interest with it into two classes: (1) a corporation's stockholders and "executive or administrative personnel," defined as those employees who are "paid on a salary, rather than hourly, basis and who have policymaking, managerial, professional, or supervisory responsibilities;"[22] and (2) all other employees not defined as executive or administrative personnel.[23] A corporation and its PAC may communicate without restriction concerning contributions to the PAC only with the corporation's stockholders and executive or administrative personnel.[24] Solicitation of a corporation's hourly employees, however, is limited to twice in one year, and must be in writing and addressed to those employees at their residences.[25] The terms "solicit" and "solicitation" are not defined by the FECA.

As a result of the FECA Amendments of 1976, and the sanctions imposed for violations of their provisions,[26] these appellants conformed their political communications to the § 441b prohibitions. The Martin Tractor Company, its PAC, and its executive and administrative personnel no longer communicate freely with hourly employees about the PAC, and solicitations are made only twice a year, in writing at the residences of hourly employees.[27] According to the appellants' complaint, but for the § 441b restrictions and the threat of sanctions, they would resume the extent and manner of communication they engaged in previously.

Other appellants in the *Martin Tractor* case include Alton Box Board Company and its PAC, and Texas Steel Company, its PAC, and its president. The PACs of both these companies were not established until 1976[28] and neither had solicited hourly employees prior to the 1976 amendments. Their alleged injury is that they *would* commence communications with hourly employees more than the prescribed twice a year, and at places other than employees' residences, were it not for the FECA and its sanctions.[29]

Appellants in the *Martin Tractor* case allege that their behavior has thus far conformed to the statutory mandate. They make no allegation of an intention—immi-

21. *Martin Tractor* App. 7–9.

22. 2 U.S.C. § 441b(b)(7) (1976).

23. 2 U.S.C. § 441b(b)(4)(B) (1976).

24. 2 U.S.C. § 441b(b)(4)(A)(i) (1976).

25. 2 U.S.C. § 441b(b)(4)(B) (1976). The Federal Election Commission ("FEC" or "Commission") has adopted regulations which implement the statutory provisions complained of by these appellants. 11 C.F.R. Part 114 (1979). The regulations divide the corporate community into two classes and restrict communication between them in exactly the same manner as § 441b. 11 C.F.R. §§ 114.6, 114.7 (1979).

26. The FECA imposes substantial civil and criminal penalties for violations of its provisions and contains elaborate enforcement mechanisms leading to their imposition. The FEC is first required to endeavor to correct or prevent violations through informal methods leading to a conciliation agreement. 2 U.S.C. § 437g(a)(5)(A) (1976). As part of a conciliation agreement, the FEC may require payment of penalties equivalent to those available in a civil suit for enforcement. *Id.* §§ 437g(a)(6)(A)–(B). If conciliation fails, the FEC may bring a civil action with penalties of $5,000 or an amount equal to the expenditure or contribution involved in the violation. *Id.* § 437g(a)(5)(B). In the event of a knowing and willful violation, the penalties may be doubled. *Id.* §§ 437g(a)(6)(A), (a)(7). Without regard to any pending conciliation proceedings, the FEC may refer knowing and willful violations to the Attorney General of the United States for criminal prosecution. *Id.* § 437g(a)(5)(D). Criminal penalties for violations of the FECA include imprisonment and fines of $25,000 or treble the amount involved. *Id.* § 441j(a). The civil enforcement provisions were amended in 1980, but the nature and severity of the penalties that may be imposed were not changed. FECA Amendments of 1979, Pub.L.No.96–187, § 108, 93 Stat. 1339, 1358–62 (1980).

27. *Martin Tractor* App. 7–9.

28. *Martin Tractor* App. 10, 12.

29. *Martin Tractor* App. 10–14.

nent or otherwise—to violate the statute, and the Federal Election Commission ("FEC" or "Commission"), charged by the statute with enforcement of its terms,[30] has no cause to commence enforcement, nor even to threaten enforcement, of the challenged statutory provisions against them.[31] Insofar as appears from their complaint, appellants did not communicate in any way with the FEC before this action was commenced.

Like the court below, we find that the case in its present posture is not ripe for decision. We ground our holding in the constitutional as well as the prudential aspects of the ripeness doctrine. We differ with the district court only slightly in our separate analysis of the doctrine as applied to first amendment challenges to statutes "on their face."

### B. *The Statute on Its Face*

Neither the Act[32] nor the FEC's implementing regulations[33] define the prohibited solicitations. "Solicit" can, of course, mean a variety of things.[34]

Although the context differs, the Supreme Court has recently addressed the meaning of "solicitation" and the constitutional implications of proscribing behavior so described.[35] In doing so, it has upheld against constitutional attack application of a state-imposed ban on solicitation by lawyers, *Ohralick v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), but has also invalidated under the first amendment a ban on such solicitation as applied in a non-remunerative context, *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). Since the Court had earlier announced that it would not entertain facial attacks upon limitations to "commercial speech," *Bates v. State Bar*, 433 U.S. 350, 379–81, 97 S.Ct. 2691, 2706–07, 53 L.Ed.2d 810 (1977), these "solicitation" cases were decided in a fairly complete factual context and upon a well-developed record. Despite the differences between "commercial" and "non-commercial" speech,

---

**30.** 2 U.S.C. § 437c(b) (1976).

**31.** The most appellants in *Martin Tractor* are able to argue is that

[t]he FEC has never indicated to Appellants that it would permit an intentional violation of the statute to create a test case or agree not to initiate any civil or criminal proceedings in connection therewith.

Brief for *Martin Tractor* Appellants at 25 n.11. Because all appellants are conforming to and not violating the challenged section, there would be no reason for the Commission to initiate an investigation, 2 U.S.C. § 437g(a)(2) (1976), or to enter into a "conciliation agreement" with appellants, *Id.* § 437g(a)(5)(A), or to institute a civil action in federal district court to enforce the section against them. *Id.* § 437g(a)(5)(B).

**32.** *See, e. g.,* 122 Cong.Rec. 12477 (1976) (remarks of Sen. Domenici) (commenting on the FECA Amendments of 1976): "The conference report fails to adequately define 'solicit' or 'solicitation' thereby raising additional questions of what is possible and what is not." *But see* 122 Cong.Rec. 12200 (1976) (remarks of Rep. Hays): "any action [that] could fairly be considered a request for a contribution should be treated as a solicitation."

**33.** 11 C.F.R. §§ 114.5, 114.6 (1979) (solicitation by corporations); 11 C.F.R. § 114.7 (1979) (solicitation by membership organizations or co-

operatives); 11 C.F.R. § 114.8 (1979) (solicitation by trade associations).

**34.** Addressing the Securities Exchange Act's prohibition of the solicitation of certain proxies, one circuit court has concluded that solicitation "is a question of fact dependent upon the nature of the communication and the circumstances under which it is transmitted." *Sargent v. Genesco, Inc.*, 492 F.2d 750, 767 (5th Cir. 1974).

**35.** On earlier occasions the Court has reviewed determinations made by the NLRB concerning the lawfulness under the National Labor Relations Act of employer-imposed bans on membership "solicitation" by unions. *NLRB v. Baptist Hosp.*, 442 U.S. 773, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Although these cases did not discuss first amendment rights (*but see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)), it is apparent that the lawfulness of the Board's determinations in those cases depended in large measure on the care with which the respective rights of employees and management had been balanced with reference to the time, place and manner of "solicitation" prohibited.

we think it is not insignificant that details about the kind, manner and purpose of the "solicitation" were crucial to the Court's decisions in *Ohralick* and *Primus*—the very kind of details which are absent here.

The inherent vagueness of the term "solicit," coupled with the Commission's failure to define the term by regulation, might at first glance be thought to militate in favor of reaching the merits of appellants' claims. The decided cases demonstrate that the extent of the chill upon first amendment rights induced by vague or overbroad statutes is the most significant factor in determining whether an otherwise premature or abstract facial attack such as we have here is ripe for decision.[36]

Hence, we examine the nature and extent of the potential chill to determine whether there is in fact a ripe case or controversy in the absence of any enforcement threat or even certainty that the appellants and the FEC will ever be at odds about the interpretation of the Act's prohibition of "solicitation" activities. We find the extent of the chill induced by the statutory provision at issue here a very limited one.

First, to the extent that it offers a prompt means of resolving doubts with respect to the statute's reach, the advisory opinion (AO) mechanism written into the FECA,[37] under which the Commission is authorized to give advice concerning the Act's application to specific factual situations,[38] mitigates whatever chill may be in-

**36.** *Bates v. State Bar*, 433 U.S. at 380–81, 97 S.Ct. at 2707; *Laird v. Tatum*, 408 U.S. at 11, 92 S.Ct. at 2324 (*citing* cases); *Walker v. City of Birmingham*, 388 U.S. 307, 344–45, 87 S.Ct. 1824, 1845, 18 L.Ed.2d 1210 (1967) (Brennan, J., dissenting) "[Supreme] Court has modified traditional rules of standing and prematurity" in order to "insulate all individuals from the 'chilling effect' upon exercise of First Amendment freedoms generated by . . . overbreadth"); *Davis v. Ichord*, 442 F.2d 1207, 1214–15 (D.C.Cir.1970); *Nat'l Student Ass'n v. Hershey*, 412 F.2d at 1115 ("[i]n determining whether a given chilling effect is sufficient, it would seem relevant to consider, *inter alia* : . . . the severity and scope of the alleged chilling effect on First Amendment freedoms . . . "); *Reed Enterprises v. Corcoran*, 354 F.2d 519, 523 (D.C.Cir.1965). *See* Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844, 853 (1970); Note, *Overbreadth Review and the Burger Court*, 49 N.Y. U.L.Rev. 532 (1974).

**37.** As amended in 1976, the FECA provided:
   The Commission shall render an advisory opinion, in writing, within a reasonable time in response to a written request by any individual holding Federal office, any candidate for Federal office, any political committee, or the national committee of any political party concerning the application of a general rule of law stated in the Act or chapter 95 or chapter 96 of Title 26, or a general rule of law prescribed as a rule or regulation by the Commission, to a specific factual situation. 2 U.S.C. § 437f (1976). This section was amended by the FECA Amendments of 1979, Pub.L.No.96–187, § 107, 93 Stat. 1357–58 (1980). The Act now provides:
   Not later than 60 days after the Commission receives from a person a complete writ-

ten request concerning the application of this Act, chapter 95 or chapter 96 of the Internal Revenue Code of 1954, or a rule or regulation prescribed by the Commission, with respect to a specific transaction or activity by the person, the Commission shall render a written advisory opinion relating to such transaction or activity to the person.
   *Id.*

**38.** Ironically, the restrictions on solicitations from hourly employees challenged here were added in reaction to a broad "advisory opinion" under which such solicitations were generally permitted. *See* 122 Cong.Rec. 8863–66 (remarks of Reps. Frenzel, Hays, Wiggins), 8881 (remarks of Rep. Thompson) (1976).
   Dissatisfied with the FEC's position, the House passed a bill which would have required all advisory opinions stating rules of general applicability to be submitted to Congress for review. That requirement was deleted in Conference, *see* H.R.Conf.Rep.No.94–1057, 94th Cong., 2d Sess. 43–45 (1976), but the Conference substituted a requirement that advisory opinions be issued only with respect to "specific fact situations," and prohibited the Commission from issuing any advisory opinions except those which "relate to the application of a general rule of law which is stated in the Act . . . or which already has been prescribed by a rule or regulation." *Id.* at 44.
   As can be seen from comparing the advisory opinion provisions before and after the 1980 amendments, the language which tied the issuance of advisory opinions to "specific factual situations" has been revised. Advisory opinions are now tied to "a specific transaction or activity by the person [requesting advice]." Pub.L.No.96–187, § 107, 93 Stat. 1358 (1980).

duced by the statute and argues against constitutional adjudication on a barren record.[39]

At the time this case was argued, only specified individuals and groups—but including "political [action] committees"[40] —were eligible to seek advisory opinions.

The FECA Amendments of 1979 have broadened the class of those eligible to seek such opinions to include any "person."[41] AOs are binding in the sense that reliance on an AO was and is a defense to criminal prosecution or civil suit.[42] In addition, AOs must be issued promptly. The Act now

**39.** *Cf. W. E. B. DuBois Clubs v. Clark*, 389 U.S. 309, 312, 88 S.Ct. 450, 452, 19 L.Ed.2d 546 (1967) (per curiam) (declining to reach merits of first amendment claim in view of administrative mechanism required by statute to be followed before compliance with challenged registration provisions might have been compelled). *See Eccles v. Peoples Bank*, 333 U.S. 426, 434, 68 S.Ct. 641, 645, 92 L.Ed. 784 (1948) (equitable relief inappropriate where administrative intent has not come to fruition or is unknown); *Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, at 957 (D.C.Cir. 1980) (case ripe where pertinent regulations and AO have been issued).

Appellants cite that portion of the legislative history of the Act which suggests that the expedited review procedures of § 437h, invoked here, were designed to allow plaintiffs to raise constitutional issues "in court without exhausting administrative remedies to the extent the courts have jurisdiction under established principles." 120 Cong.Rec. 35134 (1974) (Rep. Hays). *See also* 120 Cong.Rec. 35140 (1974) (Rep. Frenzel). But even if § 437h applied, "established principles" which confine adjudication to concrete and developed fact situations would require the same conclusion.

**40.** As amended in 1974, the FECA defined a "political committee" as follows:

any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000.

2 U.S.C. § 431(d) (1976). Advisory opinions, first authorized in 1974, have routinely been requested by and issued to corporate and trade association political action committees or separate segregated funds. *E. g.*, AO 1979–38 (Jul. 31, 1979), *reprinted in* Federal Election Campaign Financing Guide (CCH) ¶ 5422 (solicitation of administrative personnel of franchisees) (corporate political action committee); AO 1978–83 (Dec. 18, 1978), *reprinted in* Federal Election Campaign Financing Guide (CCH) ¶ 5382 (convention booth for seeking solicitation approvals) (trade association political action committee). The Act's definition of "political committee" has been clarified and revised; it now expressly includes "separate segregated fund[s]." (In addition, separate segregated funds now constitute "political committees" irrespective of the amount of contributions re-

ceived or expenditures made.) *See* H.R.Rep. No.96–422, 96th Cong., 1st Sess. 5 (1979), U.S. Code Cong. & Admin.News 1979, pp. 2860, 2864. FECA Amendments of 1979, Pub.L.No. 96–187, § 101, 93 Stat. 1339 (1980). *But see* 125 Cong.Rec. S19099 (daily ed. Dec. 18, 1979) (remarks of Sen. Bumpers) (amendment to be read in light of purpose to regulate federal elections; funds established to engage in state and local election activities not required to register or report); 125 Cong.Rec. H12365 (daily ed. Dec. 20, 1979) (remarks of Reps. Frenzel and Thompson) (same).

**41.** Pub.L.No.96–187, § 107, 93 Stat. 1358 (1980).

**42.** As amended in 1976, the Act provided as follows:

(1) Notwithstanding any other provision of law, any person who relies upon any provision or finding of an advisory opinion in accordance with the provisions of paragraph (2) and who acts in good faith in accordance with the provisions and findings of such advisory opinion shall not, as a result of any such act, be subject to any sanction provided by this Act or by chapter 95 or chapter 96 of Title 26.

(2) Any advisory opinion rendered by the Commission . . . may be relied upon by (A) any person involved in the specific transaction or activity with respect to which such advisory opinion is rendered; and (B) any person involved in any specific transaction or activity which is indistinguishable in all its material aspects from the transaction or activity with respect to which such advisory opinion is rendered.

2 U.S.C. § 437f(b) (1976). The Act now provides:

(c)(1) Any advisory opinion rendered by the Commission . . . may be relied upon by—

(A) any person involved in the specific transaction or activity with respect to which such advisory opinion is rendere' and

(B) any person involved in a..y specific transaction or activity which is indistinguishable in all its material aspects from the transaction or activity with respect to which such advisory opinion is rendered.

FECA Amendments of 1979, Pub.L.No.96–187, § 107, 93 Stat. 1358 (1980).

requires that the Commission act within sixty days of the request for advice.[43]

When a means like this one is available to reduce uncertainty or narrow the statute's reach and that means can be pursued at little risk to the rights asserted, the chill induced by facial vagueness or overbreadth is *pro tanto* reduced.[44]

A second reason for skepticism about the extent of the chill suffered in these cases is the uncertain scope or nature of the legal rights alleged to have been invaded. The statutory provision at issue in the *Martin Tractor* case restricts "solicitation" of contributions by corporations and corporate PACs of the corporation's own employees. The Supreme Court has recently warned that corporations and their representatives may not be denied at least some of the first amendment rights accorded individuals or other sorts of organizations, *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), but earlier cases have suggested that the first amendment rights of corporations with respect to communications with their own employees may not be as strong or as extensive as their first amendment rights to communications with the public at large. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). The chill suffered cannot be deeper or broader than the rights enjoyed and precedent here suggests a thin layer of potential chill.

At any rate, few decisions reaching the merits of facial first amendment attacks have involved the first amendment rights of for-profit corporations[45] and further-more, most cases reaching the merits of facial first amendment challenges have shown indicia of ripeness absent here.

The most recent such case considered by the Supreme Court, *Village of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), is an apt illustration. At issue there was the Village's prohibition of certain "solicitation" activities by charitable organizations who are not able to show that at least 75 percent of the solicitation proceeds are used for "charitable purposes." In finding the ordinance facially invalid, the Court expressly disclaimed reliance on uncontroverted "facts" presented by the charitable organization showing that less than 75 percent of their solicitation proceeds were used for "charitable purposes." Thus, the factual context was incomplete. It was not, however, completely lacking. The types of activity in which the organization had engaged and planned to engage were alleged with some particularity, *id.*, at 830, and the Village's intention to enforce the ordinance against the complaining organization was clear. *Id.*[46]

Similarly, in *Bellotti, supra*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707, the Massachusetts attorney general had specifically threatened enforcement of the challenged statutory provision against the three corporations who sought declaratory relief. *Id.* at 769, 98 S.Ct. at 1412. In addition, the case was submitted upon "66 paragraphs of stipulated facts and 70 pages of supporting documents relevant to those stipulations," *First Nat. Bank of Boston v. Attorney Gen.*, 371 Mass. 773, 359 N.E.2d 1262, 1268 (1977),

---

**43.** *See* note 37, *supra*. The FECA formerly required only that AOs be issued "within a reasonable time." 2 U.S.C. § 437f (1976).

**44.** In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the advisory opinion mechanism was argued as a means of saving the Act's expenditure limitations from unconstitutional vagueness, but the Supreme Court rejected the argument, noting that advisory opinions were available only to a few specified individuals and groups and that they were not required to be issued except within a reasonable time. *Id.* at 40 n. 47. Both these aspects of the AO mechanism have been amended and the susceptibility of the FECA to challenge on the

grounds of vagueness has consequently been reduced.

**45.** *See, e. g., Bellotti, supra*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707; *Linmark Assoc., Inc. v. Township of Willingboro*, 431 U.S. 85 (1977) (township's prohibition of "for sale" signs to prevent "white flight"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (town's prohibition of topless entertainment).

**46.** The Village had denied the organization a required permit.

a record which the Massachusetts Supreme Judicial Court characterized as "sufficient to support this adjudication." *Id.* at 1268.[47]

Other cases teach a similar lesson.[48] In all these cases, either the activities in which the complainants wished to (or had) engaged or the enforcing authority's particular intent to enforce the statute, or both, were clear enough to show the adversarial posture assumed by the parties and the contours of their dispute. Not so here.

The lack of specificity of plaintiffs' alleged intentions has already been described. The Commission, for its part, has said or done nothing to our knowledge to indicate how it construes the term "solicit." The Commission's regulations simply parrot the statutory language in this respect and although numerous advisory opinions have been issued, none cited by the parties shed much light on the Commission's interpretation of "solicitation" activities. Appellants may thus be left without substantial guidance to regulate their conduct, but we are also left without substantial guidance to decide this case or even to frame the constitutional issues at stake.

The statute specifically allows some solicitation, limited in the case of hourly employees to written communications, twice a year, addressed to the employee's home. Given the ambiguity of the word "solicit," we are essentially being asked to decide that Congress may not delegate to the FEC—as it has to the NLRB[49]—the task of deciding in the first instance what should be permitted and what forbidden in the inherently coercive context of employer-employee relationships. We are hesitant so to rule.

Finally, appellants contend that their claims are no less ripe than those of the plaintiffs in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), who obtained a decision on the merits without first violating the statute or pursuing administrative relief or clarification through an advisory opinion. Addressing this court's determination that the issue relating to the Commission's method of appointment was not ripe for decision, the Supreme Court there acknowledged that " '[p]roblems of prematurity and abstractness' . . . may prevent adjudication in all but the

---

47. *See* 435 U.S. at 769, 98 S.Ct. at 1412.

Finally, the decision to reach the merits was initially made by a state and not a federal court, a circumstance under which some aspects of the ripeness doctrine may not play as large a role in the Court's own decision. *See Adler v. Bd. of Educ.,* 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952) (majority reached merits of case decided on merits by state court; Frankfurter, J., dissented on ripeness grounds).

48. *Broadrick v. Oklahoma,* 413 U.S. at 609, 93 S.Ct. at 2914 (complainants were charged by state authority with violation of statute); *Gooding v. Wilson,* 405 U.S. at 520, 92 S.Ct. at 1105 (complainant was criminally convicted for speech prohibited by statute); *Keyishian v. Bd. of Regents,* 385 U.S. 589, 592, 87 S.Ct. 675, 678, 17 L.Ed.2d 629 (1967) (complainants' employment had been terminated or threatened because they refused to make required "loyalty" statements); *Shelton v. Tucker,* 364 U.S. 479, 484, 81 S.Ct. 247, 249, 5 L.Ed.2d 231 (1960) (teachers' contracts were not renewed when they refused to file state-required affidavits); *Herndon v. Lowry,* 301 U.S. 242, 243, 57 S.Ct. 732, 733, 81 L.Ed. 1066 (1937) (complainant was criminally convicted for activities prohibited by statute). *Cf. Police Dep't v. Mosley,* 408 U.S. at 93, 92 S.Ct. at 2288 (equal protection analysis) (complainant who had repeatedly picketed in certain manner ceased picketing after seeking and receiving interpretation of new ordinance); *Coates v. City of Cincinnati,* 402 U.S. 611, 612, 91 S.Ct. 1686, 1687, 29 L.Ed.2d 214 (1971) (due process analysis) (complainants had been criminally convicted for conduct prohibited by the challenged ordinance); *Baggett v. Bullitt,* 377 U.S. at 363–64, 84 S.Ct. at 1318 (state authority had issued memorandum of intention to enforce oath requirement against university teachers). *See* Note, *The First Amendment Overbreadth Doctrine,* 83 Harv.L.Rev. 844, 848 (1970) (arguing ripeness of overbreadth challenges may inhere in actual enforcement of statute against challenger). *Compare Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (holding abstention improper in light of possible chill to plaintiff's first amendment rights) with *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (same case, holding declaratory relief inappropriate where change in events altered imminence of plaintiff's prohibited behavior).

49. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969), *citing NLRB v. Virginia Power Co.,* 314 U.S. 469, 479, 62 S.Ct. 344, 349, 86 L.Ed. 348 (1941).

388

exceptional case," 424 U.S. at 114, 96 S.Ct. at 680, *quoting Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588, 92 S.Ct. 1716, 1719, 32 L.Ed.2d 317 (1972), but went on to declare, quoting from *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974), that "ripeness is peculiarly a question of timing." Noting that since the time of the Court of Appeals judgment the Commission had begun to issue regulations and as to the Commission's powers not yet exercised, that "the date of their all but certain exercise is now closer by several months than it was at the time the Court of Appeals ruled," *id.* at 116–17, 96 S.Ct. at 681, the Court held the issue to be ripe for decision.

The "question of timing" before the Supreme Court in the *Buckley* case can hardly be likened to the one before us now. The Court there was faced with a broad range of fundamental challenges to the nation's election laws at a time when any further delay in adjudication—to the period during or after the 1976 Presidential campaign— would have been enormously troublesome. We see no similar urgency of decision in this case that outweighs the inadvisability of premature constitutional adjudication and note again the comparative speed with

which an advisory opinion on specific conduct can be secured.[50]

### C. *The Statute "As Applied"*

Insofar as appellants can be understood to attack the constitutionality of § 441b "as applied," our decision with respect to the facial claims presented is *a fortiori.*

The chill-reducing advisory opinion mechanism is also a relatively riskless controversy-ripening tool, requiring the Commission to state its position with respect to the specific facts for which advice is sought. It is true that appellants seeking an advisory opinion will be required to propose to the Commission "a specific transaction or activity," 93 Stat. 1358, something which they were apparently unwilling to do in this court; but the issues should be crystallized in some fashion before we rule and the AO mechanism affords a relatively riskless way of doing this.[51] We note that many "political committees" similar to the PACs here have followed the advisory opinion route to obtain clarification of the Act as it relates to specific intended conduct, and although the Commission has not much illuminated the meaning of "solicit," [52] it has issued numerous AOs defining the reach of § 441b with respect to specific factual patterns.[53]

50. Appellants argue the facial unconstitutionality of § 441b under the fifth amendment as well as under the first. As we perceive them, these arguments are not separable. A determination of the arbitrariness under the fifth amendment of the lines drawn by Congress will turn on the incidental effect of those particular lines on first amendment rights. *See Police Dep't v. Mosley*, 408 U.S. at 101, 92 S.Ct. at 2293 (equal protection analysis of ordinance drawing distinction between labor and nonlabor picketing). In the final analysis, the first and fifth amendment arguments will rise or fall together and consequently should be considered together, if possible. We thus decline now to reach the merits of appellants' fifth amendment claims.

51. As noted earlier, text at note 41, all the appellants here are now eligible to seek advisory opinions. Even if the *status quo ante* had prevailed, our decision would not have been different, because those appellants (the PACs) who were eligible to seek AOs share a commonality of interest with those that are not and there is no reason to suppose that the eligible appellants here would have been less motivated to seek advice than those not eligible to do so.

52. *But see* AO 1979–50 (Oct. 19, 1979) *reprinted in* Federal Election Campaign Financing Guide (CCH) ¶ 5434 (solicitation of union employees) (request for contributions may not be printed in union newspaper, even with caveat that contributions from union non-members will be returned, when 15 percent of newspaper circulation is to union non-members); AO 1978–83 (Dec. 18, 1978), *reprinted in* Federal Election Campaign Financing Guide (CCH) ¶ 5382 (convention booth for seeking solicitation approvals) (suggesting that use of conspicuous identifying sign or sale of promotional material may constitute unlawful "solicitation") (Aikens, Chm., dissenting, *inter alia*, on grounds of Commission's failure to address meaning of "solicit").

53. *See, e. g.,*
AO 1979–38 (Jul. 31, 1979) (solicitation of administrative personnel of franchisees);
AO 1979–31 (Sept. 15, 1979) (contributions given to unaffiliated PAC);
AO 1979–27 (Jun. 19, 1979) (payment of PAC administrative expenses);
AO 1978–97 (Jan. 16, 1979) (solicitation in union magazine);

It does not take great deal of imagination to conjure up a variety of quite different sorts of communications between the corporate plaintiffs, their PACs, their management representatives and their employees which could be characterized as "solicitations" for some purposes, pretermitting the questions whether they would be prohibited for purposes of the FECA or protected by the first amendment. A few examples will suffice: (1) a printed notice of the existence of the PAC with an address where to send money, (a) posted on the employees' bulletin boards, or (b) enclosed with their paychecks; (2) a similar notice similarly disseminated but containing an explicit exhortation or job-related inducement for contributions; (3) a meeting of employees called by corporate or PAC officials solely (a) to tell employees about the PAC and its purposes or (b) to ask employees to contribute anonymously, or identifiably; (4) announcement and implementation of a system of paycheck deductions on request; (5) advertisements in company newspapers; (6) on-the-job requests for contributions; or (7) personal home visits to request contributions. We are left to speculate both on the conduct of the appellants and on the enforcement posture the Commission would assume with respect to that conduct. The careful examination required for first amendment analysis "as applied"[54] deserves more of a record than that presented here.

Because the advisory opinion mechanism is available, we do not here decide whether in some other case these appellants or other individuals, groups or corporations must

AO 1978–83 (Dec. 18, 1978) (trade association's convention booth may seek approval for corporate solicitations);

AO 1978–39 (Nov. 20, 1978) (corporate PAC and trade association PAC affiliated)

AO 1978–75 (Oct. 30, 1978) (corporate PAC may solicit stockholders of parent corporations);

AO 1978–61 (Oct. 10, 1978) (franchisor PAC may solicit executives of franchisees)

AO 1978–52 (Sept. 5, 1978) (corporation may distribute information about Congressmen to its stockholders);

AO 1977–67 (Jun. 28, 1978) (non-stock corporate PAC may solicit dues-paying "members" who indicate a desire to be members);

AO 1978–26 (Jun. 15, 1978) (beneficial owners of stock may be solicited);

AO 1978–27 (Jun. 9, 1978) (managers of a corporation's cafeterias and motels are executives for solicitation purposes);

AO 1976–79 (Apr. 14, 1978) (solicitations by organizations without members);

AO 1977–70 (Mar. 29, 1978) (PAC of a licensing corporation may solicit the executives of franchisees);

AO 1977–71 (Mar. 17, 1978) (trade association may solicit executives of a management corporation);

AO 1977–44 (Jun. 11, 1978) (trade association may solicit members of affiliated trade associations);

AO 1977–32 (Dec. 20, 1977) (trade association may not solicit executives of member municipal corporations without permission of corporations);

AO 1977–56 (Dec. 19, 1977) (proper method of handling employee contributions to PAC);

AO 1977–18 (Nov. 18, 1977) (limitation on trade association PAC's solicitation of board members who are also officers of member corporations);

AO 1977–17 (May 27, 1977) (commodity exchange PAC may not solicit representatives who are not full members);

AO 1976–96 (Nov. 11, 1976) (trade association PACs may not solicit executives of non-consenting corporations);

AO 1976–18 (Sept. 20, 1976) (soliciting contributions by selling tee-shirts is prohibited);

AO 1976–27 (Sept. 2, 1976) (solicitation of trade association members approved under certain circumstances).

The Commission's Advisory Opinions are reported in Federal Election Campaign Financing Guide (CCH).

*See also* our recent ruling in *Nat'l Conservative Political Action Comm. v. FEC*, No. 78–1543 (D.C.Cir. Mar. 11, 1980), involving the validity of an advisory opinion concerning the lawfulness of a contribution solicitation proposed by the Democratic National Committee. In that case we held that the procedural issue there raised was ripe for adjudication when "the Commission passed upon the legality of a concrete solicitation proposed in some detail by DNC."

54. *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (ordinance forbidding "sound trucks" on public streets upheld as applied). *Cf. Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (eligibility requirement for unemployment compensation as applied to Seventh Day Adventist violates free exercise clause). *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 302–03, 94 S.Ct. 2714, 2716–17, 41 L.Ed.2d 770 (1973); *Int'l Soc'y for Krishna Consciousness v. Bowen*, 600 F.2d 667 (7th Cir. 1979), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

choose between total inaction and action that may invoke FEC disfavor.[55] Nor are we suggesting that resort to the advisory opinion mechanism of the FEC is required in all cases of constitutional challenge before they become ripe for adjudication.

### III.   THE *National Chamber* CASE, NO. 79–1027

The *National Chamber* case raises the question of the constitutionality of the FECA's restrictions on solicitation by separate segregated funds, 2 U.S.C. §§ 441b (b)(4)(A)(i), 441b(b)(4)(C), 441b(b)(4)(D) (1976).[56] The statutory language challenged in *National Chambers* is in some ways broader and less clearly focused than that challenged in *Martin Tractor.*

The emphasis in *National Chamber* is on the FECA's blanket prohibition of solicitations rather than on the specific language of the Act's narrow statutory exceptions.[57] Since the provisions challenged in *National Chamber* restrict more than an employer's activities with respect to its own employees, the cases suggesting narrow first amendment rights with respect to communications to employees and a correspondingly lean layer of potential chill do not contribute much insight into analysis of the claims made here.

On the other hand, the *National Chamber* case presents an even more elusive factual context than that presented in *Martin Tractor.* Appellants here—the Chamber of Commerce of the United States, its PAC and officials—allege nothing more than a "desire to communicate with political action committees" or, in the case of individual appellant Roland that he "would undertake . . . communications to political action committees."[58] Nowhere do these appel-

---

55.   *See United Pub. Workers v. Mitchell*, 330 U.S. 75, 88–90, 67 S.Ct. 556, 563–564, 91 L.Ed. 754 (1947); *Joseph v. United States Civil Serv. Comm'n*, 554 F.2d 1140, 1150 n. 17 (D.C.Cir. 1977) (questioning the continuing validity of *Mitchell* to challenges under the Hatch Act).

56.   *See* note 1, *supra*, for the text of these provisions.

57.   The design of the statute is one which states a general prohibition and follows this by narrowly drawn exceptions. Thus the Act prohibits *all* solicitations except those expressly permitted. Appellants in *Martin Tractor* devote their energies to the narrowness of the particular exception created for non-management employees and to the greater breadth of the management employees exception. Appellants in *National Chamber* concentrate their attention on the implications of the general prohibition rather than on the narrowness of the particular exceptions, although they also object to the special emphasis given by the regulations, *infra*, note 59, to solicitations of parties with a specified relationship to the solicitor.

58.   *National Chamber* App. at 11. Paragraphs 14 and 15 of their complaint explain the types of "communications" in which they wish to engage and the basis for their grievance:

14.   The "solicitation" activities of the Plaintiffs are non-partisan in nature and consist not merely of a request for contributions, but more importantly consist of and are directed to the dissemination of ideas, opinions, and political information about matters of vital national concern. Through these "so-

licitation" activities, by both the written and spoken word, the Plaintiffs discuss those political, social and economic forces, events and decisions which have significant implications for the private enterprise system and those who share or believe in the benefits of this economic philosophy. Through their "solicitation" activities, the Plaintiffs discuss the programs of the Alliance as a means of affecting and helping to shape the process of decision-making on such matters. In short, through their "solicitation" activities, Plaintiffs state the rationale for making voluntary contributions to the Alliance as a means of voluntarily associating with *persons of similar social and political beliefs* and of furthering the common goals and objectives shared by the Plaintiffs and those who read or hear the Plaintiffs' views. The activities of the Plaintiffs described above are protected by the First Amendment guarantees of freedom of speech and freedom of association.

15.   The voluntary contributions to the Alliance made by those to whom the Plaintiffs' "solicitation" activities are directed manifest their agreement with and support for the philosophy espoused by the Plaintiffs and make possible the conduct of the programs of the Alliance through which this philosophy may be communicated to the electorate. The ability of the Plaintiffs to communicate their words, thoughts and ideas to a broadly based audience for the purpose of "soliciting" their financial assistance as an expression of their support for the Plaintiffs' announced political philosophy and goals is significantly circumscribed by certain provisions of the Act,

lants define with any precision the form, content, method, place or frequency of that communication except in the broadest of terms—terms that merely parallel the general language of the FECA and the Commission's regulations.

In this case, as in the *Martin Tractor* case, appellants do not so much as threaten a statutory violation; they have not communicated with the FEC concerning the activity they would like to undertake, and the FEC has taken no action to enforce the statute or its regulations[59] against them, nor has it threatened to do so.[60]

The district court's dismissal of the *National Chamber* complaint followed by two weeks its dismissal of the complaints in *Martin Tractor*. Noting in its memorandum opinion that the two cases raised "nearly identical" issues,[61] the district court rested its dismissal in *National Chamber* on ripeness grounds and referred to its decision in *Martin Tractor* for a fuller explanation of reasons.

We follow suit. The joinder of issue (if such it can be termed) in the *National Chamber* case, like the joinder of issue in *Martin Tractor*, is not one ideally postured for constitutional adjudication and, for all the reasons discussed above with respect to the *Martin Tractor* case, we decline to reach the merits here.

## IV. CONCLUSION

We therefore affirm the district court's dismissal of the complaints filed in these cases.[62] Since the substantive ques-

---

which limit the Plaintiffs' "solicitation" activities only to those few categories of solicitees enumerated in the Act. This unlawful restriction on Plaintiffs' "solicitation" activities likewise abridges the right and ability of those potential solicitees not enumerated in the Act to associate with the Plaintiffs by making voluntary contributions to the Alliance.

*Id.* at 5–6.

**59.** One regulation adopted by the FEC is addressed more specifically than the underlying statute to the prohibition of solicitation by trade association PACs of the PACs of their corporate members. 11 C.F.R. § 114.7(j) (1979). In urging the case is "ripe" for adjudication, appellants in *National Chamber* emphasize the adoption of this regulation. Brief for *National Chamber* Appellants at 44–49. But as we read the statute a crucial ambiguity inheres in the word "solicit," regardless of the identity of the parties of whom "solicitation" is forbidden. We thus do not agree with the *National Chamber* appellants that adoption of the regulation has ripened their dispute sufficiently to render it justiciable.

**60.** Indeed, appellants' first amendment rights to "discuss those political, social and economic forces, events and decisions which have significant implications for the private enterprise system" with "those who share or believe in the benefits of this economic philosophy" are in fact not challenged by the FEC, which insisted in the district court:

nothing in the Act prohibits any corporation or corporate PAC from discussing those political, social and economic forces, events and decisions which have significant implications for the private enterprise system . . . . . Rather, the subsection challenged here states

only that it shall be unlawful for a corporation or corporate PAC to use corporate funds to "solicit contributions" from other than those enumerated for use in federal campaigns. Plaintiffs are free from statutory restraints contained in section 441b(b)(4)(A)(i) in the discussion of general political issues and should not be heard to argue that the provision so restricts them.

Points and Authorities in Support of Defendants' Motion to Dismiss, *National Chamber* App. at 35.

**61.** *National Chamber* App. at 97.

**62.** We note that Judge Parker of our own district court has quite recently upheld the constitutionality of § 441b—as applied to a corporation without capital stock (the "NRWC") which had solicited contributions from persons other than its "members." *FEC v. Nat'l Right to Work Comm.*, Civ.Nos. 77–2175, 78–0315 (D. D.C. Apr. 24, 1980). In that case an advisory opinion had been requested, the request renewed, and a draft opinion submitted by the staff to the Commission before an investigation of the NRWC was begun. When subsequent conciliation efforts concerning NRWC's actual conduct proved unsuccessful, the NRWC brought an action for declaratory and injunctive relief and the Commission a civil enforcement action. The cases were submitted to the court on cross-motions for summary judgment after the parties had "conducted extensive discovery and agreed upon a comprehensive stipulation of facts supported by three volumes of exhibits." *Id.* at 8. Without suggesting any view of the merits of that opinion, we note the highly developed record on which the constitutionality of § 441b was there determined.

tions of the FECA's constitutionality were not and should not have been reached, the FECA's *en banc* certification provision, § 437h, need not have been applied [63] and the question whether these appellants may proceed under that section [64] need not now be answered.

The district court in *NRWC* expressly addressed the ambiguity of the Act and acknowledged that the "outward boundaries of the word [solicitation] may be uncertain," but found, nevertheless, that the specific activities in which the NRWC had engaged "lay at the heart" of the § 441b ban. *Id.* at 12. We, on the other hand, have no way of determining whether appellants' activities do or do not lie "at the heart" of the statutory prohibition. The district court found the term "solicit" certain enough as applied to the NRWC to preclude vagueness and overbreadth challenges. In the facial challenges we address, we find the term "solicit" uncertain enough to require a better-developed record where that can be obtained without leaving the rights at stake in jeopardy.

**63.** *See Clark v. Valeo,* 559 F.2d at 645 n.2:

> A District Judge requested to make certification under § 437h should be free to dismiss for want of jurisdiction, or to permit that question be decided by this court *en banc,* much as a single judge asked to seek convening of a three-judge court under 28 U.S.C. § 2284 may determine threshold jurisdictional questions himself or herself, or call for such a court and allow that court to decide the matter.

The Act provides that the district court shall certify to the *en banc* circuit court "all questions of constitutionality of *this Act*." 2 U.S.C. § 437h (1976) (emphasis supplied).

**64.** *See* notes 5 and 6, *supra.*