**BREAD POLITICAL ACTION COMMITTEE et al., Plaintiffs,**

v.

**The FEDERAL ELECTION COMMISSION et al., Defendants.**

**No. 80–1146.**

United States Court of Appeals, Seventh Circuit.

Argued En Banc June 16, 1980.

Decided Dec. 5, 1980.

---

**3.** This decision does not affect Nu–Way's right to sue Service in Illinois.

Jeffrey N. Cole, Chicago, Ill., for plaintiffs.

Kathleen Imig Perkins, Washington, D. C., for defendants.

Before FAIRCHILD, Chief Judge, SWYGERT, CUMMINGS, PELL, SPRECHER, BAUER, WOOD and CUDAHY, Circuit Judges.

CUMMINGS, Circuit Judge.

In this action, we are presented with four questions concerning the constitutionality of 2 U.S.C. § 441b(b)(4)(D), a provision of the Federal Election Campaign Act ("Act")

(2 U.S.C. §§ 431 *et seq.*).[1]  The questions come to us on certification from the district court pursuant to 2 U.S.C. § 437h.

## I. *Introduction*

In March 1977, plaintiffs brought this suit under 2 U.S.C. § 437h [2] seeking a declaration that Section 441b(b)(4)(D) is unconstitutional and asking the district court to grant a permanent injunction against enforcement thereof.  Plaintiffs are the National Restaurant Association and the National Lumber and Building Material Dealers Association, both incorporated trade associations, and the Bread Political Action Committee, the Restaurateurs Political Action Committee and the Lumber Dealers Political Action Committee.  The three plaintiff political action committees were organized respectively by the American Bakers Association, the National Restaurant Association and the National Lumber and Building Material Dealers as separate segregated political action funds and were registered with the Federal Election Commission pursuant to 2 U.S.C. § 433.  Plaintiffs named as defendants the Federal Election Commission ("Commission"), its eight members and, because he is empowered to take appropriate action on the Commission's referrals of apparent statutory violations, the Attorney General of the United States (Plaintiffs' App. 17).

The challenged provision is one of the 1976 permissive exceptions to Section 441b(a) of the Act, which prohibits contributions or expenditures by "any corporation

1.  Throughout this opinion we will refer to various sections of the Act by their numbers in Title 2 U.S.C. rather than by their statutory numbers.

2.  Section 437h provides:
    "(a) The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.
    "(b) Notwithstanding any other provision of law, any decision on a matter certified under subsection (a) of this section shall be reviewable by appeal directly to the Supreme Court of the United States.  Such appeal shall be brought no later than 20 days after the decision of the court of appeals.
    "(c) It shall be the duty of the court of appeals and of the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any matter certified under subsection (a) of this section."

whatever" or "any labor organization" in connection with a federal election. But an exclusion, added by the amendment to the Act in 1972 and now contained in Section 441b(b)(2)(C), allows corporations and labor organizations to use general treasury funds for "the establishment, administration, and solicitation of contributions to a separate segregated fund [3] to be utilized for political purposes" by the parent organization. These segregated funds may be used to make contributions to candidates in federal elections subject only to restrictions imposed elsewhere in the Act and not in issue here.

A segregated political fund and its parent organization are restricted, however, as to whom they may solicit for fund contributions. Section 441b(b)(4)(A)(i) makes it unlawful for a corporation or its segregated political fund to solicit contributions from anyone other than its stockholders and their families or its executive or administrative personnel and their families, while Section 441b(b)(4)(A)(ii) makes it unlawful for a labor organization or its segregated political fund to solicit contributions from any person other than its members and their families. These prohibitions are in turn subject to three exceptions added in 1976. Paragraph (B) of Section 441b(b)(4) permits corporations to make two annual written solicitations of their rank–and–file employees and their families. See 11 C.F.R. § 111.6(a). Paragraph (B) also permits labor organizations representing corporate unit employees to make two annual written solicitations of the corporate shareholders and all corporate employees, whether members of the union or not. See 11 C.F.R. § 114.6(b). Paragraph (C) permits membership organizations, cooperatives and corporations without capital stock or their segregated political funds to solicit contributions from their members.

The last exception, paragraph (D) of Section 441b(b)(4), is the focus of the present litigation. This provision permits a trade association or its segregated political fund to solicit contributions from the stockholders and executive and administrative personnel of its member corporations and their families provided that such solicitation has been approved by the member corporation and the member corporation has not approved a solicitation by any other trade association for the same calendar year. The full text of Section 441b(b)(4)(D) is as follows:

"This paragraph [Paragraph (A) of Section 441b(b)(4)] shall not prevent a trade association or a separate segregated fund established by a trade association from soliciting contributions from the stockholders and executive or administrative personnel of the member corporations of such trade association and the families of such stockholders or personnel to the extent that such solicitation of such stockholders and personnel, and their families, has been separately and specifically approved by the member corporation involved, and such member corporation does not approve any such solicitation by more than one such trade association in any calendar year."

All of Section 441b is set out in the Appendix hereto.

In September 1977, pursuant to 2 U.S.C. § 437h, plaintiffs filed a motion below for immediate district court certification to us of certain questions they had submitted to that court pertaining to the constitutionality of the foregoing provision. This motion was denied two days thereafter, and on October 7 the district court denied plaintiffs' motion for a preliminary injunction. We granted leave to appeal on December 21, 1977. On appeal, the principal question

---

**3.** The Act now provides that separate segregated funds are "political committees." 2 U.S.C. § 431 as amended by Pub.L.No.96–187 (93 Stat. 1339). As the Supreme Court noted in *Pipefitters v. United States*, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11, the separate segregated funds are not "meaningfully 'separate' from the sponsoring union [or trade association] in any way other than 'segregated'". 407 U.S. at 426, 92 S.Ct. at 2270. The separation required by the Act is a separate bank account and a separate ledger. 407 U.S. at 413–417, 92 S.Ct. at 2263. In short, the separate segregated funds are simply political arms of the parent organizations.

before us was whether the five plaintiffs had standing to invoke 2 U.S.C. § 437h (set out in note 2 *supra*).

On January 12, 1979, this Court decided that plaintiffs do have standing to invoke Section 437h and thus have all their constitutional challenges certified by the district court for initial review by this Court sitting *en banc. Bread Political Action Committee v. Federal Election Commission*, 7 Cir., 591 F.2d 29. Therefore, the cause was remanded to the district court, which at plaintiffs' request subsequently certified the following four questions[4] to us:

"1. Whether 2 U.S.C. § 441b(b)(4)(D), both facially and as applied, infringes plaintiffs' right of assembly guaranteed by the First Amendment to the Constitution of the United States of America?

"2. Whether 2 U.S.C. § 441b(b)(4)(D), both facially and as applied, deprives plaintiffs of liberty without due process of law in violation of the Fifth Amendment of the Constitution of the United States?

"3. Whether the failure of the Federal Election Campaign Act, as amended, 2 U.S.C. § 431 *et seq.*, to define the term 'solicitation' infringes plaintiffs' right of assembly guaranteed by the First Amendment to the Constitution of the United States, or deprives plaintiffs of liberty without due process of law in violation of the Fifth Amendment to the Constitution of the United States?

"4. Whether the failure of the Federal Election Campaign Act, as amended, 2 U.S.C. § 431 *et seq.*, to define the term 'trade association,' as used in 2 U.S.C. § 441b(b)(4)(D), violates the due process clause of the Fifth Amendment to the Constitution of the United States?"

At the same time, the court handed down 215 findings of fact drawn from a joint stipulation of facts and the parties' proposed findings (Com'n App. 47a–111a). Their correctness is not before us. Before answering the questions posed, three juris-

dictional arguments of the Commission must be addressed.

## II. *Standing, Case or Controversy, and Breadth of Certified Questions*

■ The Commission has reargued that the plaintiffs have no standing under Section 437h. This question was decided adversely to the Commission by a panel of this Court in January 1979 (591 F.2d 29). We decline to overrule that decision and note that the Ninth Circuit has agreed with us by holding that the California Medical Association and its political action committee had sufficient standing to obtain a judicial ruling on constitutional questions certified under Section 437h. *California Medical Association et al. v. Federal Election Commission et al.* (9th Cir. No. 79–4426, decided May 23, 1980) appeal–Supreme Court jurisdiction reserved until hearing on merits, ── U.S. ──, 101 S.Ct. 67, 66 L.Ed.2d 19.

■ The Commission also contends, although more obliquely than it did in the district court, that in answering the four certified questions we would be rendering an advisory opinion rather than deciding a case or controversy as required by Article III of the Constitution (Br. 53, 67–68). The district court's exhaustive findings of fact (Com'n App. 47a–111a), uncontroverted by the Commission, are clear proof why this is a live controversy and in no way mooted. The plaintiffs and defendants remain poles apart as to the meaning and constitutionality of Section 441b(b)(4)(D). Until that controversy is resolved, plaintiffs will continue to be threatened by defendants as to the legality of their present and proposed activities. Accordingly, any argument based on a lack of case or controversy required by Article III of the Constitution is frivolous. This same argument was made in the Commission's 1978 brief (at p. 5) and therefore must have been decided (at least *sub silentio*) against the Commission in our previous *Bread Political Action Committee* case;

---

**4.** The district court polished plaintiffs' draft questions into their present form (Com'n App. 45a -46a).

otherwise the panel would not have remanded the cause so that the district court could certify the constitutional questions (591 F.2d at 36). In any event, the question was decided adversely to the Commission in *Buckley v. Valeo*, 424 U.S. 1, 12, 96 S.Ct. 612, 613, 46 L.Ed.2d 659, and in *California Medical Association, supra.*[5]

■ The Commission has also submitted that Section 437h must be read narrowly and may only be used to challenge facially unconstitutional provisions of the Act (Br. 9–11). We again disagree. Section 437h empowers federal appellate courts "to construe the constitutionality of any provision of this Act" by declaratory judgment. This provision does not limit certified questions to "appropriate questions" of constitutionality as the Commission urged in 1978 (Br. 9, 10, 13) and again now (Br. 11–12). Rather, Section 437h requires the district courts to certify "all questions of constitutionality of this Act" to the various circuit courts of appeals. The term "appropriate" as used in Section 437h modifies "actions" and not "questions of constitutionality" as the Com-

mission would have it. *Bread Political Action Committee v. Federal Election Commission*, 591 F.2d 29 (7th Cir. 1979). Therefore, we adhere to our previous decision and the majority opinion in *California Medical Association, supra,* at ——, in refusing to limit our review to the facial constitutionality of provisions of the Federal Election Campaign Act or, as Judge Wallace would hold (at pp. —— – —— of his concurring and slip op.), to questions of exceptional importance as to its constitutionality.[6]

### III. *Plaintiffs' Right of Assembly Has Not Been Impermissibly Infringed*

■ The first question certified to us is "[w]hether 2 U.S.C. § 441b(b)(4)(D), both facially and as applied, infringes plaintiffs' right of assembly guaranteed by the First Amendment to the Constitution of the United States of America." In support of an affirmative answer to this question, plaintiffs first argue that Section 441b(b)(4)(D) is an impermissible prior restraint (an issue not specifically certified)[7]

---

**5.** Even the concurring and dissenting opinion of Judge Wallace in *California Medical Association, supra,* did not accept the Commission's case or controversy argument. See pp. —— – ——. Moreover, he expressly disavowed the D.C. Circuit opinions taking that tack, noting that they ignored *Buckley v. Valeo,* 424 U.S. 1 at 11–12, 96 S.Ct. 613 at 630. See note 11 of his opinion. The panel of this Court that decided the earlier *Bread Political Action Committee* case was also critical of the D.C. Circuit's reasoning in related cases. 591 F.2d at 35 n. 11. The Commission relies here on *Martin Tractor Co. v. Federal Election Commission,* 627 F.2d 375 (D.C.Cir.1980), certiorari denied *sub nom. National Chamber Alliance for Politics v. Federal Election Commission,* —— U.S. ——, 101 S.Ct. 360, 66 L.Ed.2d 218, which was decided a fortnight before the *California Medical Association* case but not brought to the Ninth Circuit's attention. We are not convinced that *Martin Tractor* is contrary to the position we have taken here in that the court there appears to have based its dismissal for lack of case or controversy largely on the easy availability of advisory opinions from the Commission to eliminate or at least focus the questions presented for review while in this case the questions are already clearly focused. But to the extent that *Martin Tractor* is not distinguishable we are, like the Ninth Circuit, in disagreement with the D.C. Circuit.

**6.** *Mott v. Federal Election Commission,* 494 F.Supp. 131 (D.D.C.1980) is distinguishable. In that case, the district court dismissed the complaint of one plaintiff on ripeness grounds and the complaint of the other plaintiffs on the merits because the questions raised were answered by *Buckley v. Valeo, supra.* In so doing, it took the position that Section 437h requires certification only of "substantial" constitutional questions, holding that unripe constitutional questions and constitutional questions that had already been decided can be dismissed without certification. Because the questions presented here are "substantial," we need not decide whether Section 437h requires certification of all constitutional questions regardless of their substantiality.

**7.** We agree with the dissent herein (p. 635 *infra* and n. 2 of dissent) that we should address the prior restraint issue since plaintiffs raised it below and Judge Marshall at least referred to the First Amendment in his first question addressed to us.

On October 6, 1980, the Supreme Court ruled that further consideration of the question of its jurisdiction over the *California Medical Association* case is postponed until the hearing of the appeal on the merits (1980), —— U.S. ——, 101 S.Ct. 67, 66 L.Ed.2d 19.

or, in the alternative, an unjustifiable infringement on their associational freedoms. We are unpersuaded by these arguments and answer the first question in the negative.

■ It is, of course, well established that association and solicitation are forms of political expression protected under the First Amendment. *N.A.A.C.P. v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73. But these activities are not protected absolutely and may be subject to governmental regulation where there is an overriding state interest in such regulation. *Buckley v. Valeo*, 424 U.S. 1 (*per curiam*).

The transcendent legislative objective served by the Federal Election Campaign Act is the elimination of corruption and the appearance of corruption in the federal election process. *Id.* The restrictions imposed by Section 441b of the Act on labor organizations and corporations, including incorporated trade associations, are designed to serve both this objective and the additional objective of protecting individuals from economic coercion. *United States v. United Automobile Workers*, 352 U.S. 567, 570–584, 77 S.Ct. 529, 530, 1 L.Ed.2d 563; *United States v. Congress of Industrial Organizations*, 335 U.S. 106, 113, 68 S.Ct. 1349, 1353, 92 L.Ed. 1849.

The challenged provision is, as noted, one of the exceptions to the broad prohibition of Section 441b(a) against contributions and expenditures by corporations and labor organizations in connection with federal elections. Section 441b(a) clearly withstands First Amendment attack. *United States v. Boyle*, 482 F.2d 755, 763–765 (D.C.Cir.1973), certiorari denied, 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483; *United States v. Chestnut*, 533 F.2d 40, 50–51 (2d Cir. 1976). The 1972 exclusion in Section 441b(b)(2)(C) permits the limited use of corporate and union general treasury funds to establish political action committees denominated "separate segregated funds" in the Act. See note 3 *supra*. This exclusion is clearly intended to strike a balance between the

objectives served by banning the use of corporate and union funds in federal elections and permitting wholly unrestricted association between the regulated groups and those individuals in a direct relationship with them. 117 Cong.Rec. 43, 379–381 (1971). The 1976 exceptions set forth in paragraphs (A), (B), (C) and (D) of Section 441b(b)(4) simply define that balance.

Corporations, including incorporated trade associations, are allowed unlimited solicitation of their stockholders, if any, and their families and their administrative or executive personnel and their families. (2 U.S.C. § 441b(b)(4)(A); 11 C.F.R. § 114.-5(g)(1).) Labor organizations, membership organizations, co-operatives and corporations without capital stock, including trade associations, are permitted unlimited solicitation of their members and, in the case of unions, their families (2 U.S.C. § 441b(b)(4)(A) and (C); 11 C.F.R. §§ 114.-5(g)(2) and 114.7(a).) In short, there is no restriction on the number of times a regulated group may solicit contributions to its political action committee from those in direct relationship to it.

In addition, corporations, including incorporated trade associations, are permitted to make two annual written solicitations of their rank–and–file employees. (2 U.S.C. § 441b(b)(4)(B); see also 11 C.F.R. § 114.-6(a).) Unions are permitted analogous contacts with employees of a corporation in which the union represents members working for the corporation. (2 U.S.C. § 441b(b)(4)(B); see also 11 C.F.R. § 114.-6(b)).

Solicitations beyond those just described are, with one further exception, prohibited altogether by paragraph (A) of Section 441b(b)(4). That exception is the challenged provision, paragraph (D) of Section 441b(b)(4), which permits trade associations to solicit any number of times the shareholders and executive or administrative personnel (and families thereof) of their member corporations if the member corporation has approved the solicitations and has not approved any other trade association's solicitation for the same calendar year. See 11

C.F.R. § 114.8(c) and (e). It is obvious that paragraph (D) is intended to provide trade associations with a potential pool of solicitees otherwise forbidden them under paragraphs (A), (B), and (C).

Plaintiffs do not challenge the validity of paragraph (A), (B), or (C), and we note that paragraphs (C) and (A)(i) were recently upheld against First Amendment challenges similar to those brought here against paragraph (D). *Federal Election Commission v. National Right to Work Committee,* 501 F.Supp. 422 (D.D.C.1980). There Judge Parker concluded that "to the extent the statute restricted plaintiffs' ability to solicit, it represents a marginal infringement on these rights and is fully justified by the need to protect the electoral process." At 438.[8]

Plaintiffs' complaint is that the additional avenue of solicitation allowed them under paragraph (D) is too limited to withstand constitutional scrutiny. We disagree. Nothing in Section 441b(b)(4)(D) limits the expression or dissemination of political ideas and information either to the individuals described in the Section or to any other individual. Indeed, there has been no showing that this provision has had or could have any prior restraining effect whatsoever on the free flow of political information and opinion by trade associations or their political action committees. To the contrary, Judge Marshall's uncontested findings of fact (Com'n App. 47a–111a) establish that plaintiffs are engaged on a daily basis and unimpeded by paragraph (D) in a broad range of First Amendment activities.

Nor does Section 441b(b)(4)(D) prohibit, as plaintiffs suggest, trade associations from joining the shareholders and executive or administrative employees of its member corporations to it in common cause. They are free to solicit any individual, including those just described, to join their trade associations.[9] Once an individual joins a trade association, he or she may be solicited for contributions without limitation under Section 441b(b)(4)(C). The political committees are of course free to accept contributions made to them by shareholders and employees of member corporations without solicitation on the trade associations' or their political committees' part. Finally, trade associations and their political committees are free to urge any individual to support or oppose a particular candidate and even to contribute directly to a candidate's campaign fund.

What plaintiffs cannot do is freely solicit contributions from the shareholders and employees of their member corporations for the use of their own political committees. Because there is no limit on the number of trade associations to which a corporation may belong, the restrictions in Section 441b(b)(4)(D) serve to prevent a proliferation of trade associations and solicitations which would in turn undermine the very purpose of the Act's restrictions on the use of corporate treasuries in federal elections. The effect of the dissent's disposition invalidating Section 441b(b)(4)(D) would be, of course, to make any solicitation of its corporate members' shareholders and administrative/executive personnel unlawful be-

---

**8.** See also *California Medical Association v. Federal Election Commission,* (9th Cir. No. 79-4426, decided May 23, 1980), appeal–Supreme Court jurisdiction reserved until hearing on merits, 49 LW 3245, in which it was held that Section 441b(b)(2)(C) does not contravene the First or Fifth Amendments.

**9.** The dissent takes the view that this activity is effectively precluded because of the Commission's broad construction of the term "solicitation." (pp. 636–637, *infra*). The Act, however, clearly prohibits the solicitation of contributions to the separate segregated funds, not solicitation of membership in the trade associations themselves. The Commission's Advisory

Opinion 1979–13 prohibits neither solicitation of memberships nor solicitation of contributions to separate segregated funds by trade association members. To the contrary, it permits solicitation of members. Plaintiffs' App. 330; CCH Federal Election Campaign Financing Guide ¶ 5403 at 10,419. Moreover, it seems to us that the thrust of the dissent's position is that the vagueness or overbreadth of the term "solicitation" has a "chilling effect" on plaintiffs' efforts to gather like-minded individuals into its fold. Yet the dissent concurs in Part V, which holds that the term is neither vague nor overbroad.

cause such solicitations are prohibited under Section 441b(b)(4)(A) except as provided in Section 441b(b)(4)(D). To the extent that the corporate approval requirement has a "prior restraining" effect on the solicitations only allowed by virtue of Section 441b(b)(4)(D) itself, we think it both tenuous and amply justified by the necessity of providing a mechanism to prevent the exception from swallowing the whole.[10]

Plaintiffs' reliance on *Village of Schaumburg, supra,* is misplaced. There an ordinance restricting door–to–door and on–street solicitations for charitable contributions was struck down for overbreadth. The Supreme Court explicitly recognized that "[s]oliciting financial support is undoubtedly subject to reasonable regulation," but found the ordinance in question too broadly framed because it prohibited legitimate political advocacy as well as the fraudulent solicitation it was intended to prevent. 444 U.S. at 632, 100 S.Ct. at 833. In the instant case, the governmental objective of protecting the electoral process is, to begin with, much weightier than guarding against fraudulent solicitations for charity. More importantly, however, the provision here is not overbroad. To the contrary, it is a very narrowly drawn aspect of a statutory scheme carefully designed to balance a compelling governmental interest and jealously guarded First Amendment freedoms. Cf. *California Medical Association v. Federal Election Commission, supra,* note 5; *Federal Election Commission v. National Right to Work Committee, supra.*

*Consolidated Edison Co. v. Public Service Commission,* —— U.S. ——, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), and *First National Bank v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707, are also unsupportive of plaintiffs' cause. The former did not deal with money solicitations for elections and is inapt. In the latter, the Supreme Court invalidated a Massachusetts criminal statute prohibiting certain business corporations from making contributions or expenditures to influence referenda. Here we are concerned with Congressional opposition to excessive spending in connection with candidate elections. The Supreme Court noted the distinction: "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections * * * simply is not present in a popular vote on a public issue." 435 U.S. at 790, 98 S.Ct. at 1423.

The cases dealing with the Federal Election Campaign Act are the cases in point. The leading case is, of course, *Buckley v. Valeo, supra.* In *Buckley,* the Supreme Court upheld, *inter alia,* ceilings on campaign contributions which clearly have far greater impact on plaintiffs' fund-raising ability than the minor restriction in issue here. Thus in accord with *Buckley* and the cases noted upholding other provisions of Section 441b, we conclude that Section 441b(b)(4)(D) does not impermissibly infringe plaintiffs' right of assembly.[11] Realistically Congress cannot be expected to draw the perfect law envisioned by the dissent (at p. 639 *infra*), but adequate procedural safeguards against improper sanctions are available through the established Advisory Opinion machinery contained in Section 437f which immunize those persons who obtain favorable opinions from the Commission and also those activity is materially indistinguishable.

## IV. Plaintiffs' Right to Liberty Under the Due Process Clause of the Fifth Amendment Has Not Been Violated

■ The second question certified to us is "[w]hether 2 U.S.C. § 441b(b)(4)(D), both

---

**10.** We of course do not hold that subsection (D) does not have any restraining effect as the dissent infers (at p. 636 *infra*).

**11.** Both certified questions one and two refer to the constitutionality of Section 441b(b)(4)(D) "facially and as applied." The only "application" we have discovered comes from the Commission's statutory construction expressed in its brief and at oral argument. Since the parties have not separately treated the "as applied" facet, we will refrain from discussing it in any vein except to state that we find no First or Fifth Amendment unconstitutionality in the Commission's construction of the statute, which will presumably be followed when the Commission applies this Section.

facially and as applied, deprives plaintiffs of liberty without due process of law in violation of the Fifth Amendment to the Constitution of the United States." We again answer in the negative.

Plaintiffs' argument on this issue is that the equal protection guarantee subsumed in the Fifth Amendment has been violated because corporations and labor unions may under paragraphs (A) and (B) of Section 441b(b)(4) solicit the permissible solicitees without prior approval of anyone while paragraph (D) requires trade associations to obtain prior approval from a member corporation before soliciting the shareholders or executive or administrative employees of that member corporation. This argument is largely premised, however, on a misreading of the statute.

It is simply not correct that plaintiffs are prohibited by paragraph (D), as they claim, from soliciting anyone other than the shareholders or executive or administrative employees of their membership corporations (Plaintiffs' Br. at 88). Both the literal statutory language and the Commission's regulations interpreting the statute indicate clearly that paragraphs (A), (B), (C) and (D) are not parallel provisions, each addressed to a different regulated group. Incorporated trade associations, because they are corporations, have precisely the same solicitation rights under paragraphs (A) and (B) as do other corporations. 11 C.F.R. § 114.-8(i)(2). Moreover, trade associations are also membership organizations or corporations without capital stock and are therefore provided precisely the same solicitation rights as they have under paragraph (C). 11 C.F.R. § 114.7(c). Finally, trade associations are provided under paragraph (D) with an additional group of potential solicitees. 11 C.F.R. § 114.8(c).

Federated trade associations also have broad solicitation rights. A federation of trade associations may solicit its own shareholders (if any), employees and members in accordance with the rules just described. A trade association may also delegate its own solicitation rights to a federation (11 C.F.R. § 114.8(g)(1)(i)) or conduct a joint solicitation with the federation (11 C.F.R. § 114.-8(g)(1)(ii)), thereby allowing the federation to solicit the non–corporate business and individual members of the individual trade association; the shareholders, executive or administrative personnel and their families of the individual trade association; and the shareholders and executive or administrative personnel and their families of the corporate members (with approval) of the individual trade association. In addition, a federated trade association may, subject to the same rules as those applied to international unions and their constituent locals, solicit the individual and noncorporate members of their regional, state and local affiliates (11 C.F.R. § 114.8(g)(1)) and the shareholders and executive and administrative personnel and their families of corporate members of such affiliates. 11 C.F.R. § 114.8(g)(2). Thus to the extent that trade associations are treated differently from other corporations and other membership organizations, the difference lies in the fact that trade associations are not limited as are the others to soliciting their own shareholders, employees or members.[12]

Furthermore, the somewhat dissimilar treatment of corporations, labor organizations, membership organizations and trade associations under Section 441b(b)(4) follows from the rather obvious facts that each of the different groups has a different structure and a different kind of constituency and that each requires somewhat different regulation to curb abuses the Act was intended to halt. Regulatory distinctions and exceptions tailored to serve a substantial governmental interest, as here, do not violate the Fifth Amendment's equal protection provision. See *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 98–99, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212. It is important to keep in mind that the restrictions in issue here apply only where a trade asso-

---

**12.** Labor organizations are permitted one solicitation contact outside their membership. This is the rather limited right to solicit by mail twice annually the shareholders and nonmember employees of corporations some of whose employees they represent.

ciation employs corporate funds to undertake its solicitations. The same individuals who organize these political committees are free to establish a political committee independent of, rather than merely segregated from, the corporate treasury and corporate funds and thereby be free to solicit "the world." The reason Congress chose to allow trade associations to solicit the stockholders and executive or administrative employees (and their families) of member corporations (with their approval)[13] is undoubtedly because the member corporations themselves cannot make political contributions *per se* to the trade association's political committee. 2 U.S.C. § 441b(a). At the same time, the restrictions placed on this potential pool of solicitees serves, as we have said earlier, to prevent the exception from swallowing the whole.

Finally, the relationship that obtains between a trade association and the employees of its member corporations differs significantly from that existing between union members and their unions. Individuals join with other individuals in common cause as members of their union, and the union thus becomes their representative organization. A trade association is also a representative, membership organization, but it exists to promote the interests of its corporate and individual members, not the interests of the employees of its corporate members. Because the corporate employees are neither employed by nor represented by the trade associations, any equal protection comparison between the activities available to trade associations with respect to the employees of their corporate members with those available to labor organizations with respect to their membership or the employers of their membership runs afoul of plain-

tiffs' failure to demonstrate how trade associations and labor organizations are "similarly situated" parties.[14] Accordingly, we conclude that Section 441b(b)(4)(D) does not deprive plaintiffs of liberty without due process in violation of the Fifth Amendment.[15]

V. *It Is Unnecessary for Section 441b(b)(4)(D) to Define "soliciting contributions"*

■ The third question certified to us is as follows:

"Whether the failure of the Federal Election Campaign Act, as amended, 2 U.S.C. § 431 *et seq.*, to define the term 'solicitation' infringes plaintiffs' right of assembly guaranteed by the First Amendment to the Constitution of the United States or deprives plaintiffs of liberty without due process of law in violation of the Fifth Amendment to the Constitution of the United States?"

The phrase "soliciting contributions" is not unconstitutionally vague since people "of common intelligence" need not "necessarily guess at its meaning and differ as to its application * * *." *Baggett v. Bullitt*, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377. Statutes and rules using the term "solicit" have been uniformly upheld. *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 462, 464, 98 S.Ct. 1912, 1921, 1922, 56 L.Ed.2d 444; *In re Primus*, 436 U.S. 412, 438, 98 S.Ct. 1893, 1908, 56 L.Ed.2d 417; *Republic Aviation Corporation v. National Labor Relations Board*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; *Securities and Exchange Commission v. May*, 229 F.2d 123 (2d Cir. 1956); *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir. 1974); *Federal Election*

**13.** The record does not show that such approval "is generally refused" as the dissent would speculate (at p. 642 *infra*) or that plaintiffs do not seek to solicit all corporate employees because of lack of commonality of interest (n.10 at p. 642 *infra*).

**14.** Plaintiffs attempt to circumvent this difficulty by suggesting that the appropriate test here is whether all the regulated groups are afforded the same solicitation rights with respect to those sharing a "commonality of interest" with

them. Leaving aside the considerable definitional and linedrawing problems that such a test would involve, plaintiffs have failed to demonstrate why a commonality of political interest between shareholders and employees of member corporations and trade association political committees should be assumed simply because the corporations belong to the trade association.

**15.** See note 11 *supra*.

*Commission v. National Right to Work Committee, supra,* at 430. Consequently, plaintiffs do not contend that the absence of a definition of "soliciting contributions" in Section 441b(b)(4)(D) renders Section 441b(b)(4)(D) unconstitutionally vague (Br. 79). Instead, they claim only that the "overbreadth" of this phrase permits the issuance of inconsistent opinions by the Federal Election Commission.

Plaintiffs are particularly critical (Br. 71–75) of Advisory Opinion 1979–13, in which the Commission concluded that a proposed article for inclusion in a separate segregated fund's publication going to employees and retirees was a solicitation within the meaning of the Act

> "since it describes RAYPAC's activities and encourages employees to participate in RAYPAC by commending the enthusiasm of these employees whose participation in RAYPAC has indicated awareness of the connection between their welfare and government policies toward business." (Plaintiffs' App. at 330.)

Since the article could in all fairness be considered by a reasonable person to be a request for a contribution,[16] the Commission cannot be faulted even if we would decide differently. See note 9 *supra.* Moreover, the Commission stated the newsletter article would not be an improper contribution solicitation if it were sent only to persons that may be solicited under the statute or regulations and told the recipients that their contributions would have to be returned if coming from impermissible sources. Finally, the Commission's opinions are only advisory in nature and not binding upon the party requesting them. 2 U.S.C. § 437f. In contrast, in Advisory Opinion 1979–66, the Commission determined that publication of certain financial information by a separate segregated fund was not a "solicitation" within the meaning of the

Act. The information in question merely reported the total sum collected by the Associated General Contractors Political Action Committee and did not commend the enthusiasm of PAC contributors or encourage readers to support that separate segregated fund's activities. Since it was permissible for the Commission to come out differently in these and other cases, the Commission's Advisory Opinions do not demonstrate that the phrase "soliciting contributions" in Section 441b(b)(4)(D) is overbroad and unconstitutionally vague under the First and Fifth Amendments. That being the sole reason given for plaintiffs' attack, the third question must be answered "No."

VI. *It Is Unnecessary to Define "trade association" in Section 441b(b)(4)(D)*

■ The final constitutional question certified to us is as follows:

> "Whether the failure of the Federal Election Campaign Act, as amended, 2 U.S.C. § 431 *et seq.,* to define the term 'trade association,' as used in 2 U.S.C. § 441b(b)(4)(D), violates the due process clause of the Fifth Amendment to the Constitution of the United States?"

The only plaintiffs challenging the absence of a statutory definition of "trade association" are plaintiffs National Lumber and Building Material Dealers Association and its political action committee. They claim that they are unable to ascertain whether they may solicit only the executive and administrative personnel of its 27 incorporated trade association members or also the executive and administrative personnel of the corporate members of its member trade associations.[17] The Commission has ruled that a federation of trade associations like National Lumber and Building Material Dealers Association may also solicit contri-

---

**16.** The article quoted the chairman of the corporate political action committee as follows: "I was glad to see that Raymond has so many employees who realize that the welfare of us all is tied very closely to government policies and attitudes toward business. RAYPAC is one way we can make the voice of business people in our industry heard in

this country. I hope we continued [sic] to have such an enthusiastic group." (Plaintiffs' App. at 329–331.)

**17.** Certain corporate retail dealers comprise the members of this Association's 27 corporate trade association members (Plaintiffs' Br. 102).

butions from the executive and administrative employees of its members' corporate members provided that the trade association and federation are "affiliated"; that is, that they are considered one political action committee for the purpose of contribution ceilings. See 11 C.F.R. § 114.8(g)(1) and (2); see also 2 U.S.C. § 441a(a)(5) and Commission Informational Letter, Fed.Elec. Camp.Fin. Guide, CCH ¶ 6031. If these two plaintiffs are still worried about the propriety of their proposal, an advisory opinion can of course be obtained from the Commission under Section 437f. In any event, this alleged confusion arises because of these plaintiffs' status as a federation of trade associations and a political committee of a federation of trade associations respectively, not from the absence of a statutory definition of "trade association."

"Trade association" like "solicitation," is a frequently used and well understood term. The Commission's regulations reflect the commonly understood meaning of the term. For example, 11 C.F.R. § 114.8(a), promulgated on April 13, 1976, provides:

"A trade association is generally a membership organization of persons engaged in a similar or related line of commerce, organized to promote and improve business conditions in that line of commerce and not to engage in a regular business of a kind ordinarily carried on for profit, and no part of the net earnings of which enures to the benefit of any member."

Similarly, 11 C.F.R. § 114.8(g)(1) provides:

"A federation of trade associations is an organization representing trade associations involved in the same or allied line of commerce."

In view of the plain and ordinary meaning of "trade association" and the Commission's adherence to that meaning, we conclude that the absence of a statutory definition of the term as it is used in Section 441b(b)(4)(D) does not violate the due process clause of the Fifth Amendment.[18]

---

**18.** Plaintiffs have recently called our attention to the statement in *Federal Election Commission v. Lance*, 617 F.2d 365, 367 (5th Cir. 1980) that "there is a serious question whether the Federal Corrupt Practices Act is constitution-

The cause is remanded for further proceedings consistent with the four answers given herein.

### APPENDIX

2 U.S.C. § 441b provides:

**§ 441b. Contributions or expenditures by national banks, corporations, or labor organizations**

(a) It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

(b) (1) For the purposes of this section the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

al." Since note 1 of the opinion shows that the court was referring only to Sections 441b(a) and (b)(2) which are not before us, the statement is inapplicable here.

(2) For purposes of this section and section 79*l* (h) of title 15, the term "contribution or expenditure" shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section, but shall not include ·

(A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject;

(B) nonpartisan registration and get–out–the–vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and

(C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

(3) It shall be unlawful ·

(A) for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment, or by moneys obtained in any commercial transaction;

(B) for any person soliciting an employee for a contribution to such a fund to fail to inform such employee of the political purposes of such fund at the time of such solicitation; and

(C) for any person soliciting an employee for a contribution to such a fund to fail to inform such employee, at the time of such solicitation, of his right to refuse to so contribute without any reprisal.

(4) (A) Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful ··

(i) for a corporation, or a separate segregated fund established by a corporation to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families, and

(ii) for a labor organization, or a separate segregated fund established by a labor organization, to solicit contributions to such a fund from any person other than its members and their families.

(B) It shall not be unlawful under this section for a corporation, a labor organization, or a separate segregated fund established by such corporation or such labor organization, to make 2 written solicitations for contributions during the calendar year from any stockholder, executive or administrative personnel, or employee of a corporation or the families of such persons. A solicitation under this subparagraph may be made only by mail addressed to stockholders, executive or administrative personnel, or employees at their residence and shall be so designed that the corporation, labor organization, or separate segregated fund conducting such solicitation cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution.

(C) This paragraph shall not prevent a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by a membership organization, cooperative, or corporation without capital stock, from soliciting contributions to such a fund from members

of such organization, cooperative, or corporation without capital stock.

(D) This paragraph shall not prevent a trade association or a separate segregated fund established by a trade association from soliciting contributions from the stockholders and executive or administrative personnel of the member corporations of such trade association and the families of such stockholders or personnel to the extent that such solicitation of such stockholders and personnel, and their families, has been separately and specifically approved by the member corporation involved, and such member corporation does not approve any such solicitation by more than one such trade association in any calendar year.

(5) Notwithstanding any other law, any method of soliciting voluntary contributions or of facilitating the making of voluntary contributions to a separate segregated fund established by a corporation, permitted by law to corporations with regard to stockholders and executive or administrative personnel, shall also be permitted to labor organizations with regard to their members.

(6) Any corporation, including its subsidiaries, branches, divisions, and affiliates, that utilizes a method of soliciting voluntary contributions or facilitating the making of voluntary contributions, shall make available such method, on written request and at a cost sufficient only to reimburse the corporation for the expenses incurred thereby, to a labor organization representing any members working for such corporation, its subsidiaries, branches, divisions, and affiliates.

(7) For purposes of this section, the term "executive or administrative personnel" means individuals employed by a corporation who are paid on a salary, rather than hourly, basis and who have policymaking, managerial, professional, or supervisory responsibilities.

PELL, Circuit Judge, with whom FAIRCHILD, Chief Judge, and BAUER, Circuit Judge, join, concurring in part, dissenting in part.

While I concur in parts II, V, and VI of the majority opinion, I am in disagreement with parts III and IV and their negative answers to the district court's certified questions 1 and 2. Accordingly, I respectfully dissent as to parts III and IV of the majority opinion.

As a matter of prefatory observation, I note that a fact of modern day living is that anyone who has a mailing address which has been in existence for a duration of more than a minimal period of time is besieged by a rather steady succession of solicitations to contribute to invariably worthwhile causes. These unsolicited solicitations, despite the merits applicable to the proposed donees are, by virtue of their multiplicity, frequently annoying. Nevertheless, it does not seem to me that potential annoyance should be the occasion for spreading a protective Big Brother cloak of prohibition.

Also at the outset, I note that the question of whether 2 U.S.C. § 441b(b)(4)(D) infringes the plaintiffs' First Amendment right of *speech* was not certified to this court by the district court. It is well established, however, that solicitation implicates a variety of speech interests, *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73 (1980),[1] as well as associational rights protected by the First Amendment. Consequently, it is impossible to extricate that subsection's effect on speech from an analysis of associational interests even assuming *arguendo* that this court is bound by the precise questions certified.[2]

---

1. The Court identified three speech interests involved in solicitation: communication of information, dissemination of ideas, and advocacy of causes. *Id.*

2. In the instant case, the plaintiffs' proposed statement of constitutional questions for certification phrased the first issue more broadly than the district court's final formulation. The plaintiffs would have certified the question as "[w]hether 2 U.S.C. § 441b(b)(4)(D), both fa-

*Prior Restraint*

Subsection (D)'s requirement that a trade association obtain the prior approval of its corporate member before soliciting the shareholders and executive and administrative personnel of the corporate member is, in my opinion, an invalid prior restraint. The majority holds that subsection (D) does not constitute a prior restraint because it finds no actual prior restraining effect on the free flow of political information, inasmuch as the plaintiffs still engage in many First Amendment activities.

It is true, as the majority opinion notes, that the plaintiffs do still undertake various forms of political expression. Yet, the First Amendment does not protect the rights of speech and assembly only when they are entirely abrogated. The United States Supreme Court repeatedly has stressed that total suppression of speech is not necessary to invoke First Amendment protections against otherwise invalid prior restraints. *Consolidated Edison Co. v. Public Service Commission*, —— U.S. ——, 100 S.Ct. 2326, 2335 n.10, 65 L.Ed.2d 319 (1980); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15, 96 S.Ct. 1817, 1823 n.15, 48 L.Ed.2d 346 (1978); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1974); *Spence v. Washington*, 418 U.S. 405, 411 n.4, 94 S.Ct. 2727, 2731, 41 L.Ed.2d 842 (1973) (per curiam). In *Southeastern Promotions, supra*, 420 U.S. at 556, 95 S.Ct. at 1245, for example, the Court acknowledged that "it does not matter for purposes of this case that the board's decision might not have had the effect of total suppression of the musical ["Hair"] in the community." Likewise, the fact that the plaintiffs in the instant case take advantage of avenues of political expression other than the solicitation of the prohibited groups will not validate an otherwise invalid prior restraint.

The majority opinion seems to conclude that there is no prior restraining effect in part because the plaintiffs are free to solicit anyone to *join* their organizations and, once someone joins, that person can be solicited for contributions as a trade association member an unlimited number of times. That technically is true. The Federal Election Commission (FEC or Commission), however, has so broadly construed the term "solicitation" as to create inhibiting doubt even on the solicitation of memberships.[3]

The Commission's Advisory Opinion 1979–13, for example, prohibits an organization from publishing "an article in its corporate newsletter which would inform employees of the *activities and existence of* its separate segregated fund," Federal Election Campaign Financing Guide ¶ 5403 at 10,419 (CCH) (dissenting opinion of Chairmen Aikens and Friedersdorf) (emphasis added), merely because the article "commend[ed] the enthusiasm of employees whose participation . . . has indicated awareness of the connection between their welfare and government policies toward business." *Id.* In that case, the Commission found the proposed article to be an unlawful "solicitation" even though it contained no request for contributions. The Commission's broad interpretation of "solicitations," coupled with the Federal Election Campaign Act's (FECA or Act) harsh civil

cially and as applied, violates the First Amendment." Judge Marshall subsequently narrowed the proposal to reach only subsection (D)'s effect on the right of assembly.

2 U.S.C. § 437h(a) (Supp.1979) provides that "[t]he district court immediately *shall* certify *all* questions of constitutionality of this Act to the United States courts of appeals for the circuit involved, which shall hear the matter sitting en banc" (emphasis added). It would seem therefore that a district court's failure or refusal so to certify *all* constitutional questions cannot be insulated from appellate review.

The majority apparently assumes that this court is not bound by the precise constitutional questions certified because it addresses the prior restraint issue which, it acknowledges, was not specifically certified.

3. I am not unmindful that I have concurred in Part V of the majority opinion. I have done so because I do not regard the term "solicitation" as such as being either overbroad or vague, which is not to say that it may not very well achieve a chilling impact by political overextension.

and criminal sanctions,[4] has, as a practical matter, substantially inhibited the plaintiffs' ability to communicate with the shareholders and administrative and executive employees of member corporations in their common political cause.

The majority's assertion that trade associations are free to urge any individual to support or oppose a particular candidate does not render subsection (D)'s prohibition any less severe. The United States Supreme Court recognized in *Buckley v. Valeo*, 424 U.S. 1, 22, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976), that money contributions enable "like–minded persons to pool their resources in furtherance of common political goals." Thus, while the organizations can urge anyone to support a particular candidate, their inability to solicit still impinges upon their associational interests. The Court recognized that the right to association "is diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective.' " *Buckley v. Valeo, supra*, 424 U.S. at 65–66, 96 S.Ct. at 656. Solicitation of member corporations' shareholders and administrative and executive personnel provides a particularly important source of funds for the trade associations since many of their members are corporations which are prohibited by § 441b(a) from contributing.

Finally, the majority's recognition that the plaintiffs can accept contributions from anyone, although they cannot solicit everyone, appears to me to be irrelevant. The trade associations' First Amendment interests in speech and association are nonetheless curbed by their inability to solicit those with whom they share an affinity of interest but who do not happen to contribute.

The district court's findings of fact illustrate that, while the plaintiffs can and do engage in some First Amendment activity, the prior restraint set up by subsection (D) has exerted a chilling effect on the exercise of First Amendment rights by the trade associations and the potential recipients of the solicitation.[5] The district court found, for example, that in 1977 the Restaurateurs Political Action Committee (RPAC) requested permission to solicit from 7,509 of the National Restaurant Association's (NRA) corporate members, but received permission from only 1,087. In 1978 only 1,168 members, out of the 15,759 requested, granted permission to solicit. Moreover, during its annual fundraising banquet in 1977, RPAC experienced a loss of members who were willing to sell tickets because of fear of the Act's criminal and civil penalties for violating the Act. Because of these and other difficulties imposed by the Act, the banquet was abandoned in 1978. The court also found that Bread Political Action Committee (BreadPAC) has not been able to receive authorization from the member corporations of the American Bakers Association (ABA) to solicit since 1976. But for the restriction imposed by subsection (D), the Committee would solicit the executive and administrative employees and shareholders of the member corporations. Finally, the district court found that

> [t]he 1976 Amendments to the Act have limited the ability of each of the Plaintiffs to raise voluntary funds for political purposes, have limited each Plaintiff's ability to engage in protected political speech and association, and have limited the right of persons with similar or related interests to receive from the Plaintiffs communications expressing political ideas, opinions, views, and beliefs and thereby associate themselves with the Plaintiffs.

Subsection (D) admittedly does not resemble the typical prior restraint which involves delegation of unlimited discretion to an administrative official. This is a distinction without a difference, however, because "[a]ny system of prior restraint of expression comes to this Court bearing a heavy presumption against its constitutional valid-

---

**4.** 2 U.S.C. § 437g (Supp.1979).

**5.** First Amendment protections extend to the communication, the speaker, and the intended recipients. *Virginia State Bd. of Pharmacy, supra*, 425 U.S. at 757, 96 S.Ct. at 1823.

ity." *Vance v. Universal Amusement Co.*, 445 U.S. 308, 317, 100 S.Ct. 1156, 1161, 63 L.Ed.2d 413 (1980) (emphasis in original), *quoting Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). *See, e. g., ACLU v. Jennings*, 366 F.Supp. 1041, 1049–52 (D.D.C.1973), *vacated sub nom., Staats v. ACLU*, 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975) (FECA provision held to be a prior restraint even though the Court acknowledged that it technically did not resemble a typical licensing system because the Act designated the media, not the government, to act as censor).

A statute subjecting First Amendment freedoms to a prior restraint will be upheld only if it enunciates definite and objective standards to guide the censor's discretion. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). In the present case, the Act wholly fails to establish any standards to harness the member corporations' discretion except that a corporation cannot approve solicitation by more than one trade association per year. Thus, a corporation arbitrarily can deny permission to solicit for any reason whatsoever even if it has not yet granted permission to any other trade association for that year.

A judgment that subsection (D) operates as an invalid prior restraint would not compel the conclusion that Congress cannot regulate trade association solicitation in any manner whatsoever. Rather, the statute fails because it does not set up adequate procedural safeguards. The Supreme Court has recognized that "[i]n the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute." *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 646 (1965).

*Infringement of First Amendment Freedoms*

Even if § 441b(b)(4)(D) were not invalid as a prior restraint, it would nevertheless be unconstitutional for impermissibly infringing the plaintiffs' rights of speech and assembly.[6] While these rights are not absolute, "governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.'" *Buckley v. Valeo, supra*, 424 U.S. at 24, 96 S.Ct. at 637, *quoting NAACP v. Alabama*, 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). The Court in *Buckley, supra*, 424 U.S. at 25, 96 S.Ct. at 637, ruled that a statute infringing First Amendment rights can only be sustained if (1) the restriction serves a "sufficiently important [governmental] interest," and (2) it "employs means closely drawn to avoid unnecessary abridgment of associational freedoms." A statute infringing First Amendment freedoms will be invalid if less restrictive means of accomplishing the governmental objective are available. *Village of Schaumburg, supra*, 444 U.S. at 637, 100 S.Ct. at 836. The Federal Election Campaign Act was enacted primarily to diminish the actuality and appearance of corruption in the federal election process resulting from large financial contributions. *Buckley v. Valeo, supra*, 424 U.S. at 25, 96 S.Ct. at 637. In *Buckley*, the Court's decision to uphold contribution limitations (while simultaneously striking down expenditure ceilings) was largely premised on the understanding that contribution ceilings would not reduce resources available to both candidates and political committees. It is important to note that *Buckley* predated the Act's restrictions on trade association solicitation. The Court reasoned:

> Given the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources

---

**6.** The majority opinion seems to misconceive the effect of my challenge to subsection (D). I merely think the exception provided by this subsection to subsection (A) should not be rendered virtually meaningless by the imposition of the prior consent provision. In sum, I am only challenging the prior consent aspect.

necessary for effective advocacy. There is no indication, however, that the contribution limitations imposed by the Act would have any dramatic adverse effect on the funding of campaigns and political associations. The overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons.

424 U.S. at 21–22, 96 S.Ct. at 635.

Subsection (D) nonetheless has dramatically decreased the available pool of potential contributors to the plaintiff organizations. The Lumber Dealers Political Action Committee's (LuDPAC) eight largest federated members informed LuDPAC that, but for the Act's 1976 amendments, they would have supplied LuDPAC with their membership rosters which total over 4,300 retail dealers. RPAC similarly was unable to solicit over 100,000 persons present at each of the NRA's annual 1977, 1978, and 1979 conventions who otherwise would have constituted an available solicitation pool. Bread Political Action Committee's solicitations likewise were limited by subsection (D). In 1975, BreadPAC solicited 1,250 individuals; from January to May 1976, BreadPAC had already solicited 1,904 persons. From May 11, 1976, the effective date of the 1976 amendments, through December 1976, the number of individuals solicited by Bread-PAC dropped to 462. In 1977, only 577 persons and in 1978 only 421 persons, were solicited.

The drop in the number of persons available for solicitation was reflected in a dramatic decrease in contributions. Bread-PAC's contributions, for example, declined from $40,190 in 1975, to $38,712 in 1976, to $28,000 in 1977 and $29,550 in 1978. The statistics indicate that the premise of *Buckley*, that contribution totals received by candidates and political associations should not be diminished by the Act's restrictions, is subverted by subsection (D).

The majority cites employee freedom from employer economic coercion as one purpose underlying the enactment of subsection (D). While this objective may have motivated Congress, the restrictions imposed on trade associations do not, in fact, serve that goal. The direct employment relationship existing between employer and employee provides an inherently coercive setting for employer solicitation. *Martin Tractor Co. v. FEC*, 627 F.2d 375, 387 (D.C. Cir.1980). Yet, § 441b(b)(4)(B) allows corporate employers to solicit any corporate employee twice yearly.

The Act seeks to limit further employee solicitation by requiring prior corporate approval for solicitation by trade associations. The Government contended that because trade associations represent corporate interests, corporate employees will feel bound to contribute to the associations. In fact, the potential for such coercion logically should be less in the trade association context than in the direct employer/employee relationship because employees do not depend upon the trade associations for their livelihood. Even if some compulsion arguably exists, subsection (D) heightens, rather than diminishes, any such coercion. Explicit corporate consent to trade association solicitation subtly, yet directly, would appear to suggest to employees that the employer favors a contribution.

As well as subverting the very purpose it was intended to serve, subsection (D) imposes a substantial impact upon associational freedoms. The plaintiffs' expert testified that corporate employees share an "affinity of interest" with the trade associations to which their corporate employers belong.

Consequently, subsection (D) is not a narrowly drawn provision which achieves the asserted governmental objective as the First Amendment requires. Other less drastic means could ensure employee freedom from coercion at the hands of trade associations while treading less severely upon invaluable First Amendment rights. The Act could, for example, require trade association solicitations to remind the corporate employees that they need not contribute. The Act could additionally mandate that a system of solicitation be adopted which would guarantee the anonymity of the contributor. Congress applied just such

safeguards to a corporation's solicitation of its own employees in preference to an absolute ban.[7]

The majority further reasons that because there are no limits on the number of trade associations to which a corporation can belong, subsection (D) prevents a proliferation of trade associations which might allow member corporations to undermine the Act's contribution limitations.[8] The Government argued that this result would flow from the fact that member corporations often are involved in the selection of a trade association's board of directors and that, therefore, a corporation could set up a number of "dummy" trade associations. The FEC contended that corporate members "control" trade associations' boards of directors.

The district court's findings of fact regarding the composition of the boards of directors in the instant case, however, indicate that the danger is overstated. Two directors each of the National Lumber and Building Material Dealers Association are selected by each federated member, the past two national presidents, the Association's officers, and various other persons. The NRA's board of directors, which numbers sixty members, is selected to represent NRA members according to their geographical distribution. Each member of the American Bakers Association is entitled to send one representative to sit on the ABA's governing board which is made up of approximately 350 individuals with another 350 alternates. It is obvious, therefore, that *individual* corporate "control" of any of these trade associations is diluted by the numbers of representatives of different corporations which compose each trade associa-

tion's board of directors. While the directors undoubtedly share many similar interests, their diversity in terms of factors such as size, product, or location necessarily restricts their potential identity of interest.

Finally, the Act provides other mechanisms to ensure contribution limitation compliance. Section 437g (Supp.1979) imposes civil and criminal penalties for violating the Act. Moreover, FECA establishes a comprehensive set of reporting requirements. All political committees and separate segregated funds, for example, must file with the Commission information including names of affiliated organizations, names of officers, receipts, expenditures and their recipients, names of each person, organization or political committee which has contributed over $200 per year, and any other information the Commission chooses to require.[9] No single corporation could set up a "dummy" trade association solely to subvert the Act without being exposed by the disclosure requirements and without being subject to criminal sanctions for having willfully violated the Act. Indeed, the Court in *Buckley* rejected the similar argument that limitations on candidate expenditures were necessary to ensure compliance with the Act's contribution limitations because the Act's substantial civil and criminal penalties, coupled with its exhaustive reporting requirements, were sufficient to police against illicit contributions. 424 U.S. at 56, 96 S.Ct. at 652. The Court in *Buckley* sustained the Act's contribution limitations because such limitations still allowed individuals to support candidates through special interest groups. At a time when subsection (D) did not restrict trade association solicitation in

---

**7.** 2 U.S.C. §§ 441b(b)(3)(C); 441b(b)(4)(B) (Supp.1979).

**8.** 2 U.S.C. § 441a(a)(1)(C) prohibits contributions by any person to any political committee (other than those of candidates or national political parties) in excess of $5,000 per year; § 441a(a)(1)(A) forbids any contribution to a political candidate for federal office in excess of $1,000 annually.

**9.** 2 U.S.C. §§ 433–34 (Supp.1979). I also note 2 U.S.C. § 441a(a)(5) which provides as follows:

For the purposes of the limitations provided by paragraph (1) and paragraph (2), all contributions made by political committees established or financed or maintained or controlled by any corporation, labor organization, or any other person, including any parent, subsidiary, branch, division, department, or local unit of such corporation, labor organization, or any other person, or by any group of such persons, shall be considered to have been made by a single political committee. . . .

the present manner, the Court noted with approval that

> [w]hile providing significant limitations on the ability of all individuals and groups to contribute large amounts of money to candidates, the Act's contribution ceilings do not foreclose the making of substantial contributions to candidates by some major special–interest groups through the combined effect of individual contributions from adherents or the proliferation of political funds each authorized under the Act to contribute to candidates.

424 U.S. at 28 n.31, 96 S.Ct. at 639 n.31.

*Fifth Amendment Due Process*

The majority characterizes the plaintiffs' due process argument as a complaint that subsection (D) prohibits trade associations from soliciting anyone but the executive and administrative employees of their member corporations. The opinion then proceeds to strike down that argument by pointing out that incorporated trade associations have the same solicitation rights as (1) other corporations under § 441b(b)(4)(A) and (B), and (2) other membership organizations under subsection (C), although recognizing that the structure and constituency of trade associations differs radically from that of other corporations and membership organizations.

The plaintiffs' argument is not that they are forbidden by the statute from soliciting anyone other than the group mentioned in subsection (D). Rather, the trade associations argue that while the statute technically does grant them many of the same privileges as those enjoyed by corporations and other membership organizations, these solicitation rights are largely illusory because the actual structure of most incorporated trade associations forecloses these solicitation options. The Supreme Court in *Buckley*, 424 U.S. at 31 n.33, 96 S.Ct. at 640 n.33, recognized that even when a statute facially appears to be evenhanded, "[t]he appearance of fairness, however, may not reflect political reality."

Most trade associations and federated trade associations are incorporated. As corporations, it is true that trade associations theoretically can solicit their own stockholders under § 441b(b)(4)(A). However, the Government conceded in oral argument that most incorporated trade associations are nonprofit corporations which do not have any stockholders. Thus, the typical corporation possesses a substantially greater solicitation pool than an incorporated trade association.

As a corporation, an incorporated trade association may also solicit its own executive and administrative employees and their families pursuant to subsection (A). Again, however, this pool comprises a very small group of solicitees for trade associations in comparison to most corporations. The ABA, for example, has only a twelve person staff. We do not know how many of these twelve are executive or administrative employees. BreadPAC has no staff employees of its own. ABA employees carry out BreadPAC's daily work. Similarly, the small size of most trade association staffs renders meaningless subsection (B)'s additional provision allowing corporations twice yearly to solicit their rank and file employees.

As a membership organization, a trade association can solicit its own individual and noncorporate members pursuant to subsection (C). Corporate members are prohibited from contributing by § 441b(a). Individual and noncorporate members, however, also offer an insignificant solicitation pool to trade associations unlike other more typical membership organizations. The district court found that "many, if not most, members of trade associations are incorporated."

It is this very difference in structure that should give rise to broadened, not restricted, solicitation rights for trade associations because the statutory avenues of solicitation available to corporations and membership organizations generally prove fruitless when applied to incorporated trade associations. Yet, subsection (D) requires corporate consent to carry on the only form of trade association solicitation which would

prove meaningful. My reading of the record indicates that such consent is generally refused.

A comparison between labor organizations and trade associations is illustrative. Labor organizations can, without consent, twice annually solicit shareholders and nonmember employees of corporations with which they have collective bargaining agreements. § 441b(b)(4)(B) (Supp.1979). Moreover, both a federated labor organization (e. g., AFL–CIO) and its member International (e. g., International Carpenters' Union) can solicit individual members of the locals which comprise the Internationals simultaneously and without prior permission because 11 C.F.R. § 114.1(e) (1980) provides that a local union member is also a member of the federated union for solicitation purposes.

By contrast, a federated trade association must either conduct joint solicitations or have solicitation rights delegated to it in order to solicit the members of its member trade associations. 11 C.F.R. 114.8(g) (1980). Because solicitation of regular trade association member corporations themselves is barred by § 441b(a) as the majority acknowledged, the only practical solicitation of trade association members (most of which are corporations) would be to solicit the trade association member corporation's stockholders and executive and administrative employees, the human components of the member corporations.[10] Yet, subsection (D) prohibits such solicitation without prior corporate consent.

The Government contended in oral argument that these distinctions between labor organizations and trade associations are valid because federated unions and their International members are "affiliated," and, as such, share a common $5,000 limitation on contribution to candidates for federal office. A federated trade association, however, can only solicit its regional, state and local affiliates or members if it is affiliated with these groups and, therefore, shares the $5,000 contribution limitation. 11 C.F.R. § 114.8(g)(1) (1980). Thus, the purported difference is irrelevant.

The discrimination alleged by the plaintiffs is borne out by the district court's findings of fact. The court found that "[t]he 1976 Amendments to the Act place no comparable prohibitions and limitations upon membership organizations and their political action committees, corporations and their political action committees, labor organizations and their political action committees, or independent political action committees."[11] The unique structure and composition characteristic of most trade associations differentiates them from other corporations and membership organizations as detailed above. It is this very difference, augmented by subsection (D)'s prior consent provision, which gives rise to the discrimination which the plaintiffs suffer under the statute as applied.

In order for a discriminatory classification which impacts upon fundamental First Amendment rights to survive judicial scrutiny, the governmental interest served must be substantial and the statutory classification narrowly tailored to serve that interest. *Police Department of Chicago v. Mosley*, 408 U.S. 92, 98–99, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972). As detailed above, sub-

---

**10.** It is understandable that the plaintiffs do not seek to solicit all corporate employees because all corporate employees would not share the same commonality of interest with the trade association as would the corporate shareholders and executive and administrative personnel.

**11.** The majority opinion develops at some length an orange–apple lack of relationship between unions and trade associations. I have not, in this dissent, asserted that they are "similarly situated" parties. I do suggest, however, that just as certain loyalties and commonalities of purpose do exist between a union and its membership, similar communities of interest may well exist between corporate shareholders and executive employees and the trade associations of which the corporation is a member. These trade associations have been formed for the purposes of advancing the best business interests of the particular trade. It would seem unusual if the shareholders and executive employees, whose own financial well being would be equated with that of the corporation, indeed, the trade, did not have a real interest in supporting the trade associations, that is, if they were allowed to be solicited.

section (D) is not a narrowly drawn classification which serves the interests asserted.